**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Terry KING and Valerie Jean Burdex,
Defendants–Appellees.**

Nos. 92–2142, 92–2173.

United States Court of Appeals,
Tenth Circuit.

March 26, 1993.

**1554**

Michael Edmund O'Neill, U.S. Dept. of Justice, Crim. Div., Appellate Section, Washington, DC (Don J. Svet, U.S. Atty., and James D. Tierney, Asst. U.S. Atty., Albuquerque, NM, with him on the brief), for plaintiff-appellant.

Teresa E. Storch, Asst. Federal Public Defender, Albuquerque, NM, for defendant-appellee Terry King.

Angela Arellanes, Albuquerque, NM, for defendant-appellee Valerie Jean Burdex.

Before LOGAN, ANDERSON and BALDOCK, Circuit Judges.

BALDOCK, Circuit Judge.

The government appeals the district court's orders suppressing evidence as the fruit of an unlawful seizure of Defendants Terry King and Valerie Jean Burdex. The

district court found that the police officer who seized Defendants lacked a reasonable suspicion that they were involved in criminal activity; therefore, Defendants' detention violated the Fourth Amendment. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967). The government contends that the officer's conduct was reasonable under the circumstances and therefore did not violate the Fourth Amendment. The government also argues that even if the officer's conduct violated the Fourth Amendment, the drugs, which were discarded by Burdex, were not the fruit of the unlawful detention. Our jurisdiction arises under 18 U.S.C. § 3731, and, in reviewing the district court's order, we consider the evidence in a light most favorable to Defendants. *United States v. Horn,* 970 F.2d 728, 731 (10th Cir.1992).

## I.

On April 30, 1992, at approximately 1:15 p.m., Officer LeMasters of the Albuquerque Police Department arrived at the scene of a traffic accident at a busy intersection. One of the vehicles involved in the accident remained disabled in the intersection, impeding the flow of traffic such that only one to two vehicles per traffic light could proceed, and several bystanders had gathered around the intersection. While investigating the accident, Officer LeMasters' attention was diverted by a car with heavily tinted windows. The driver was honking his horn incessantly, apparently in an effort to prompt the preceding driver to proceed through the congested intersection. Officer LeMasters testified that she approached the car in order to inform the driver of the hazardous conditions and advise him to refrain from using his horn. As she approached the car, the driver, King, ceased honking, partially rolled down his window, and apologized for the commotion claiming that he was merely trying to get through the intersection. Officer LeMasters then observed a nine millimeter pistol, with a clip inside the weapon, on the driver's seat, partially tucked under King's right thigh. State law permits motorists to carry loaded weapons, concealed or otherwise, in their vehicles. *See* N.M.Stat.Ann.

§ 30–7–2(A)(2) (Michie Supp.1992). Officer LeMasters also observed Burdex in the passenger seat whom she had not seen earlier due to the tinted windows.

Upon observing the pistol on the front seat, Officer LeMasters drew her service revolver, pointed it at King, and ordered him to place his hands on the steering wheel, threatening to shoot him if he did not comply with her order. Officer LeMasters testified that, while she did not suspect Defendants of being engaged in any criminal activity, she took this action out of concern for the safety of herself and the bystanders, despite the fact that King had not made any threatening gesture or sudden movement. While holding her revolver on King, Officer LeMasters radioed for assistance. Within a minute, Officer Palone arrived, pulling her patrol car directly in front of King's car. Officer Palone ordered King to exit the vehicle while keeping his hands in view, and King complied. Defendant Burdex also exited the vehicle on the passenger side, despite having been ordered to remain in the car. Officer Armijo, who had also responded to the call for backup assistance, joined Officer LeMasters at the rear of King's vehicle armed with a shotgun, and ordered Burdex onto a dirt area approximately twenty-five feet from the car, and she complied. Meanwhile, Officer Palone ordered King to move backwards and get down on his knees which he did. Officer LeMasters handcuffed King, while Officer Armijo removed the pistol from the front seat.

As the officers were busy securing King, Burdex, who had moved into the dirt area at Officer Armijo's request, removed a bag from her pants and dropped it near a utility box. Two bystanders who observed the incident informed the officers which led Officer Armijo to retrieve a bag containing drugs. The officers advised Defendants that they were under arrest for drug possession, and a search incident to arrest uncovered $2,700 under the driver's side floor mat and $400 in King's boot.

A federal grand jury indicted Defendants

for various drug and weapons offenses.[1] Defendants moved to suppress the drugs, gun, money and statements as the fruit of an unlawful seizure of their persons. Following an evidentiary hearing, the district court, recognizing that state law permitted motorists to carry loaded guns in their vehicles, *see* N.M.Stat.Ann. § 30–7–2(A)(2) (Michie Supp.1992), found that Officer LeMasters lacked a reasonable suspicion that Defendants were engaged in criminal activity thereby rendering their detention unlawful under *Terry.* The district court also found that the evidence was the fruit of the unlawful detention, and therefore must be suppressed.

## II.

At the outset, it is important to note the limited scope of the government's appeal. The government does not contest the district court's finding that Officer LeMasters lacked a reasonable suspicion of criminal activity. Accordingly, we express no opinion on whether a police officer's observation of an apparently loaded pistol partially tucked under a motorist's leg would support a reasonable suspicion that the motorist was engaged in criminal activity other than to note that the state law permitting motorists to carry guns in their vehicles, N.M.Stat.Ann. § 30–7–2(A)(2) (Michie Supp. 1992), is not dispositive on the issue. *See Reid v. Georgia,* 448 U.S. 438, 442, 100 S.Ct. 2752, 2754–55, 65 L.Ed.2d 890 (1980) (per curiam) ("[W]holly lawful conduct might justify the suspicion that criminal activity was afoot."). Rather, the government argues that Officer LeMasters' conduct must be judged under a reasonableness standard, and her conduct was reasonable in light of the circumstances. Because the government's challenge is limited to the proper legal standard and the reasonableness of the officer's conduct, our review is de novo. *See United States v. Evans,* 937 F.2d 1534, 1536–37 (10th Cir. 1991) ("[U]ltimate determinations of reasonableness under the Fourth Amendment,

and other questions of law, are reviewed de novo.").

### A.

"[T]he Fourth Amendment's protection against 'unreasonable ... seizures' includes seizure of the person." *California v. Hodari D.,* —— U.S. ——, ——, 111 S.Ct. 1547, 1549, 113 L.Ed.2d 690 (1991) (citation omitted). Of course, not all police-citizen encounters implicate the Fourth Amendment. *See, e.g., Michigan v. Chesternut,* 486 U.S. 567, 574–76, 108 S.Ct. 1975, 1980–81, 100 L.Ed.2d 565 (1988); *INS v. Delgado,* 466 U.S. 210, 218–21, 104 S.Ct. 1758, 1763–65, 80 L.Ed.2d 247 (1984). *See generally United States v. Bloom,* 975 F.2d 1447, 1450–56 (10th Cir.1992). "[M]ere police questioning does not constitute a seizure." *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Moreover, " 'law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place....' " *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion)). Rather, a person is seized for Fourth Amendment purposes when, considering all the surrounding circumstances, the police conduct "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at ——, 111 S.Ct. at 2389. Applying this standard to the case before us, we have little doubt that both King and Burdex were seized when Officer LeMasters ordered King at gunpoint to place his hands on the steering wheel or else be shot as such conduct would communicate to both persons in the car that they were not free to decline Officer LeMasters' request or otherwise terminate the encounter.

Be that as it may, the protection of the Fourth Amendment does "not ... guarantee against *all* ... seizures, but only

---

**1.** Defendants were charged with possession with intent to distribute cocaine base and cocaine, 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C), and using and carrying a firearm during the commission of a drug trafficking offense. 18 U.S.C. § 924(c)(1). Burdex was also charged with possession of a firearm by a felon. *Id.* § 922(g)(1).

against unreasonable ... seizures." *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). Prior to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Fourth Amendment seizures of the person were analyzed in terms of arrest, and reasonable only if supported by probable cause. *See Dunaway v. New York*, 442 U.S. 200, 208, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979). *Terry* was the first case to recognize that "the Fourth Amendment governs 'seizures' of the person ... [other than] arrests," 392 U.S. at 16, 88 S.Ct. at 1877, and created a "narrowly drawn" exception to the probable cause requirement for lesser government intrusions into an individual's liberty. *Id.* at 27, 88 S.Ct. at 1883. *See also Royer*, 460 U.S. at 499, 103 S.Ct. at 1325 (*"Terry* and its progeny ... created only limited exceptions to the general rule that seizures of the person require probable cause to arrest.").

In *Terry*, a police officer observed three men who appeared to be casing a store for an armed robbery. The officer approached the men and, believing they were armed, patted down their outer clothing, discovering that two of them were carrying guns, which led to concealed weapons charges. Narrowly framing the issue as "whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest," 392 U.S. at 15, 88 S.Ct. at 1876, the Court held:

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons may be armed and presently dangerous ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. at 1884. *Terry* has come to stand for two distinct propositions—an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, *see United States v.*

*Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection. *See Adams v. Williams*, 407 U.S. 143, 147–48, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972).

To determine whether an investigative detention or a protective search is reasonable under the Fourth Amendment, the inquiry is twofold. First, the officer's action must be "justified at its inception." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. For an investigative detention, the officer must have an articulable and reasonable suspicion that the person detained is engaged in criminal activity. *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585. For a protective search to be "justified at its inception," the officer must not only harbor an articulable and reasonable suspicion that the person is armed and dangerous, the officer must also be "entitled to make a forcible stop." *Adams*, 407 U.S. at 146–48, 92 S.Ct. at 1923–24 (footnote omitted). *See also Terry*, 392 U.S. at 32, 88 S.Ct. at 1885 (Harlan, J., concurring) (if "a policeman has a right ... to disarm a person for his own protection, he must first have a right not to avoid him but to be in his presence"); 1 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 3.8(e), at 307 (1984).

The second prong of the reasonableness inquiry of either an investigative detention or a protective search is whether the officer's action is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. An investigative detention may be unreasonable because it is "a more serious intrusion on [one's] personal liberty than is allowable on mere suspicion of criminal activity." *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27 (seizure of defendant, although supported by reasonable suspicion, was unreasonable where defendant was "as a practical matter ... under arrest"). *See also United States v. Place*, 462 U.S. 696, 709–10, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983) (ninety-minute detention of traveler's lug-

gage unreasonable). *But see United States v. Montoya de Hernandez*, 473 U.S. 531, 542–44, 105 S.Ct. 3304, 3311–12, 87 L.Ed.2d 381 (1985) (sixteen-hour detention of suspected alimentary canal smuggler at border not unreasonable); *Sharpe*, 470 U.S. at 682, 105 S.Ct. at 1573 (twenty-minute detention not unreasonable when police act diligently and suspect's action contributed to delay). Similarly, a protective search may be unreasonable when it is not limited to ensuring that the suspect is not armed. *See Sibron v. New York*, 392 U.S. 40, 65, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968) (protective search for weapons unreasonable when officer reached inside defendant's pocket without first conducting initial limited exploration). Regardless of whether the inquiry focuses on an investigative detention or a protective search, the reasonableness of the officer's action necessarily depends upon the justification for the action. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325; *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879.

### B.

The district court analyzed this case as if it were an investigative detention. The court determined that Defendants were seized when Officer LeMasters ordered King at gunpoint to place his hands on the steering wheel, and found this seizure to violate the Fourth Amendment because Officer LeMasters lacked any reasonable suspicion that Defendants were engaged in criminal activity. In essence, the court held that the seizure was not "justified at its inception."

### 1.

 The government's "reasonableness" argument suggests that Officer LeMasters' seizure of Defendants can be justified by her concern for the safety of herself and the bystanders due to her observation of the pistol within Defendants' immediate reach. As authority for its position, the government cites *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam), wherein the Supreme Court held the Fourth Amendment does not preclude the police from ordering a legally detained motorist out of his vehicle, absent any suspicion of wrongdoing. *Id.* at 109–10, 98 S.Ct. at 333. In *Mimms*, police officers stopped the defendant's car due to an expired license plate. As part of their standard procedure, one of the officers ordered the defendant out of the car. As the defendant stepped from the car, the officer noticed a bulge under his jacket and immediately frisked the defendant, finding a loaded gun which led to a concealed weapons charge. There was "no question" that the initial detention of the defendant due to the expired license plate was proper, *id.* at 109, 98 S.Ct. at 332, and the Court had "little doubt" that the subsequent frisk of the defendant after the officers observed the bulge in his jacket was permissible. *Id.* at 111–12, 98 S.Ct. at 334. In holding that the officers did not violate the Fourth Amendment by ordering the defendant out of the car without any particularized suspicion, the Supreme Court balanced the "important" interest of the officer's safety against the *"de minimus"* "intrusion into the driver's personal liberty occasioned ... by the order to get out of the car." *Id.* at 111, 98 S.Ct. at 333. As the Court stated, "[w]hat is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* (footnote omitted).

 *Mimms* does not support the government's suggestion that Officer LeMasters' seizure of Defendants was justified at its inception by her concern for the safety of herself and the bystanders due to the presence of the gun. In *Mimms*, the defendant was lawfully detained due to an expired license plate, and the de minimus intrusion in the interest of the officers' safety was reasonable partly because the police already had a basis to detain the individual. *Mimms*, 434 U.S. at 109, 98 S.Ct. at 332. *See also New York v. Class*, 475 U.S. 106, 117–18, 106 S.Ct. 960, 968, 89 L.Ed.2d 81 (1986) (de minimus intrusion reasonable partly because probable cause had focused suspicion on the affected individual). The government's argument would extend *Mimms* to allow police offi-

cers to seize any citizen whom the officers have any articulable reason to believe presents a threat to their safety. In a state such as New Mexico, which permits persons to lawfully carry firearms, the government's argument would effectively eliminate Fourth Amendment protections for lawfully armed persons. Moreover, the government's "reasonableness" standard would render toothless the additional requirement that the scope and duration of detention be carefully tailored to its underlying justification. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325; *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879. For example, if a police officer's safety could justify the detention of an otherwise lawfully armed person, the detention could last indefinitely because a lawfully armed person would perpetually present a threat to the safety of the officer. In short, while the safety of police officers is no doubt an important government interest, it can only justify a Fourth Amendment intrusion into a person's liberty "[s]o long as the officer is entitled to make a forcible stop...." *Adams*, 407 U.S. at 146, 92 S.Ct. at 1923 (footnote omitted). *See also Terry*, 392 U.S. at 32, 88 S.Ct. at 1885 (Harlan, J., concurring); 1 LaFave, *supra*, § 3.8(e).

2.

 While we cannot accept the government's attempt to justify the seizure of Defendants based on Officer LeMasters' safety concerns due to the presence of the pistol, neither can we accept the district court's application of the reasonable suspicion of criminal activity standard to the facts of this case. The reasonable suspicion of criminal activity standard presupposes an investigative purpose by the detaining officer. *See, e.g., Royer*, 460 U.S. at 502, 103 S.Ct. at 1326–27 (defendant suspected of carrying drugs); *United States v. Brignoni–Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (defendants suspected of being illegal aliens); *Terry*, 392 U.S. at 22–23, 88 S.Ct. at 1880–81 (defendants suspected of planning robbery). Officer LeMasters approached Defendants' car, not for any investigative purpose, but to alleviate what she perceived as a traffic hazard resulting from King's incessant honking at the intersection,[2] and she ordered King out of the car, again not for any investigative purpose, but to alleviate a perceived threat to the safety of herself and the bystanders due to the presence of the pistol.

 Reasonableness under the Fourth Amendment "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578. *See also Terry*, 392 U.S. at 21, 88 S.Ct. at 1880 (reasonableness determination balances "'need to ... [seize] against the invasion which the ... [seizure] entails'") (brackets in original) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 534–35, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967)). Permitting investigative detentions on less than probable cause reflects a reasoned judgment by the Supreme Court that the governmental interest in effective crime prevention and detection outweighs minor

---

**2.** Relying on the Supreme Court's statement in *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied,*" *id.* at 597, 109 S.Ct. at 1381, King argues that Officer LeMasters' lack of subjective intention to seize Defendants, prior to her observation of the pistol, precludes any finding that Defendants were seized prior to the point Officer LeMasters drew her revolver. *Brower* does not add a police officer's subjective intention to the inquiry of whether a person is seized for Fourth Amendment purposes. Rather, *Brower* stands merely for the proposition that the Fourth Amendment does not address "the accidental effects of otherwise lawful government conduct." *Id.* at 596, 109 S.Ct. at 1381. Nonetheless, we agree that Defendants were not seized until Officer LeMasters drew her revolver because it was at this point that Officer LeMasters' conduct would communicate to a reasonable person that he or she was unable to terminate the encounter. *Bostick*, —— U.S. at ——, 111 S.Ct. at 2389. Be that as it may, the fact that Defendants were not seized until Officer LeMasters drew her revolver does not preclude us from considering circumstances prior to the seizure in determining the reasonableness of Officer LeMasters' conduct. *See Montoya de Hernandez*, 473 U.S. at 537, 105 S.Ct. at 3308 (reasonableness inquiry must consider all of the surrounding circumstances).

intrusions into individual liberty occasioned by brief investigatory stops. *See Terry,* 392 U.S. at 22–23, 88 S.Ct. at 1881. *See also Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. at 3310 ("The 'reasonable suspicion' standard ... effects a needed balance between private and public interests when law enforcement officials must make a limited intrusion on less than probable cause."); *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325 ("The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect."). However, when a police officer initiates an encounter with a person for a purpose other than to investigate criminal activity, the governmental interest in effective crime prevention and detection is irrelevant. *See Montoya de Hernandez,* 473 U.S. at 537, 105 S.Ct. at 3308 (reasonableness inquiry must consider the nature of the seizure).

■■■ "Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to the desire to prosecute for crime." *Terry,* 392 U.S. at 13, 88 S.Ct. at 1875 (footnote omitted). *See also* I ABA Standards for Criminal Justice, § 1–1.1(c) at 18 (2d ed. 1986) ("those aspects of police function that relate to minimizing the likelihood of disorder ... are equal in their importance to the police function in identifying and punishing wrongdoers"). Indeed, police officers are not only permitted, but expected, to exercise what the Supreme Court has termed "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706 (1973). In the course of exercising this noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity. *See, e.g., United States v. Rideau,* 949 F.2d 718, 720 (5th Cir.1991) (officers stopped defendant for his own safety and the safety of

others after observing him standing in the middle of the road at night, dressed in dark clothes, and apparently intoxicated), *vacated on other grounds,* 969 F.2d 1572 (5th Cir.1992) (en banc) (agreeing with panel on this point); *United States v. Wallace,* 889 F.2d 580, 582 (5th Cir.1989) (officers detained defendant for his own safety after being informed that he possessed gun and had threatened suicide), *cert. denied,* 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 753 (1990). The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable per se as *Terry* only requires "specific and articulable facts which ... reasonably warrant [an] intrusion" into the individual's liberty. *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880. *See also Rideau,* 969 F.2d at 1574; *Wallace,* 889 F.2d at 582. *Cf. State v. Vistuba,* 251 Kan. 821, 840 P.2d 511, 514 (1992) (safety reasons based on specific, articulable facts may justify vehicle stop); *State v. Marcello,* 599 A.2d 357, 358 (Vt. 1991) (same); *State v. Pinkham,* 565 A.2d 318, 319 (Me.1989); *State v. Oxley,* 127 N.H. 407, 503 A.2d 756, 759 (1989) (same).

■■■ However, a person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for "[i]t is surely anomalous to say that the individual ... [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." *Camara,* 387 U.S. at 530, 87 S.Ct. at 1731 (footnote omitted). Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference. *See Brignoni–Ponce,* 422 U.S. at 878, 95 S.Ct. at 2578; *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880.

■■■ In the present case, Officer LeMasters was clearly exercising her "community

caretaking function" when she approached Defendants' car during the course of her investigation of a vehicle accident. *See Cady,* 413 U.S. at 441, 93 S.Ct. at 2528 (investigation of vehicle accidents is within police officers' community caretaking function). King's honking at the accident site created an specific, articulable basis for Officer LeMasters to believe that he might cause a second accident. Accordingly, Officer LeMasters was justified in approaching Defendants' car and could have briefly detained Defendants in order to inform King of the hazardous conditions and to advise him to cease honking, regardless of whether King's actions violated any traffic laws.[3] In balancing the respective Fourth Amendment interests, we note that Defendants were already detained at the intersection, not by Officer LeMasters, but by the congested traffic conditions due to the disabled vehicle in the intersection. Therefore, Defendants' Fourth Amendment interest is limited to the "incremental" intrusion of being required to listen to Officer LeMasters while stuck in traffic. *See Mimms,* 434 U.S. at 109, 98 S.Ct. at 332; *Walker,* 941 F.2d at 1089. On the other hand, the governmental interest in investigating accidents and ensuring the public safety at accident sites, while perhaps not compelling, is one we have come to expect from local police officers and is sufficiently important to outweigh the relatively minor intrusions on motorists, who are already stuck in traffic and whose conduct arguably creates a hazard. Under the facts of this case, Officer LeMasters had a reasonable and articulable basis to briefly detain King in order to advise him to cease honking his horn.

 When Officer LeMasters observed a pistol within Defendants' immediate reach, she escalated the encounter into a seizure, again not for an investigative purpose, but to alleviate a perceived threat to the safety of herself and the bystanders. At this point, King was in substantially the same position as the defendant in *Mimms.*

The officers in *Mimms* ordered the defendant out of his car, prior to observing the bulge in his jacket, as a matter of routine procedure in order to ensure their safety during the traffic stop. Here, Officer LeMasters saw the pistol before ordering King out of the car. Thus, her concern for her safety was based on specific articulable facts, making the justification for ordering King out of the car even more critical than that presented by the officers in *Mimms.*

 Officer LeMasters' observation of an apparently loaded pistol within Defendants' immediate reach would justify her separation of Defendants from the pistol in order to ensure her own safety during the encounter. *See Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983) (permitting limited search of passenger compartment of lawfully detained automobile and seizure of any weapon found based on reasonable suspicion that driver is dangerous and may gain control of a weapon); *Adams,* 407 U.S. at 147–48, 92 S.Ct. at 1924 (permitting limited search of lawfully detained person's outer clothing and seizure of any weapon found based on reasonable suspicion that person is armed); *Terry,* 392 U.S. at 22, 88 S.Ct. at 1880 (same). The governmental interest in the safety of police officers outweighs the individual's Fourth Amendment interest when an officer has an objective basis to believe that the person being lawfully detained is armed and dangerous. *See Long,* 463 U.S. at 1051, 103 S.Ct. at 3482; *Terry,* 392 U.S. at 23–24, 88 S.Ct. at 1881. Moreover, Defendants' lawful possession of the pistol has no bearing on the reasonableness of Officer LeMasters' actions because the interest justifying her separation of Defendants from the pistol is her safety, and a legally possessed weapon presents just as great a danger to her safety as an illegal one. *Long,* 463 U.S. at 1052 n. 16, 103 S.Ct. at 3482 n. 16; *Adams,* 407 U.S. at 146, 92 S.Ct. at 1923.

**3.** Had King violated a traffic law, Officer LeMasters would certainly have had grounds to detain Defendants. *See Mimms,* 434 U.S. at 109, 98 S.Ct. at 332; *United States v. Horn,* 970 F.2d 728, 731 (10th Cir.1992). However, the government does not argue that King's honking violated any law.

In short, Officer LeMasters had not yet advised King of the hazardous conditions his honking created, which she was entitled to do, when she observed an apparently loaded pistol within the immediate reach of both him and his passenger. Officer LeMasters was entitled to separate Defendants from the pistol by ordering them out of the car for the duration of her advisement. Officer LeMasters had an articulable safety reason justifying the initial intrusion, and any additional intrusion in asking Defendants to exit the car could "only be described as *de minimus.*" *Mimms,* 434 U.S. at 111, 98 S.Ct. at 333. To hold otherwise, would " 'unreasonab[ly] [ ] require that police officers take unnecessary risks in the performance of their duties.' " *Id.* at 110, 98 S.Ct. at 333 (quoting *Terry,* 392 U.S. at 23, 88 S.Ct. at 1881).

### C.

■■■ Having found that Officer LeMasters' detention of Defendants was justified at its inception and that Officer LeMasters could, in the course of the detention, separate Defendants from the pistol, our inquiry now turns to whether Officer LeMasters' action was "reasonably related in scope to the circumstances which justified the interference in the first place."[4] *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. *See also Royer,* 460 U.S. at 500, 103 S.Ct. at 1325. On this point, the government's reliance on *Mimms* is misplaced. In *Mimms,* a critical factor was the "de minimus" intrusion on the defendant's liberty resulting from the officer's request to step out of the car during the course of a traffic stop which the Court considered nothing more than a "mere inconvenience." *Id.* *See also Maryland v. Buie,* 494 U.S. 325, 335 n. 3, 110 S.Ct. 1093, 1099 n. 3, 108 L.Ed.2d 276 (1990); *Class,* 475 U.S. at 117, 106 S.Ct. at 967. Here, Officer LeMasters drew her

gun and pointed it at King, threatening to shoot him if he did not comply with her order. Her call for backup assistance led other officers to encircle Defendants' car with weapons drawn. Officer Palone ordered King to his knees, and Officer LeMasters handcuffed him after both Defendants were separated from the pistol and no longer presented a threat to the safety of any of the officers or bystanders. This level of governmental intrusion on Defendants' liberty is not remotely similar to ordering a motorist to step out of his car and can hardly be considered "de minimus" or a "mere inconvenience." *See United States v. Walker,* 941 F.2d 1086, 1089–90 (10th Cir.1991) (officer's additional questioning of lawfully detained motorist concerning drugs was not "mere inconvenience"), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). *Cf. Class,* 475 U.S. at 117, 106 S.Ct. at 967 (reaching inside car to remove papers obstructing VIN was de minimus intrusion).

■■■ Whether Officer LeMasters' seizure of Defendants was reasonably related in scope to its justification must focus on whether the facts available to the officer would "warrant a man of reasonable caution in the belief" that the action taken was appropriate. *Terry,* 392 U.S. at 21–22, 88 S.Ct. at 1880. There are no "bright line" rules in assessing whether Officer LeMasters' conduct was reasonably related in scope to its justification; rather, our evaluation is guided by "common sense and ordinary human experience." *Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575. *See also Montoya de Hernandez,* 473 U.S. at 544, 105 S.Ct. at 3312 (no "hard and fast time limits" on *Terry* stop before it becomes an arrest). While police officers are not required to use the least intrusive means in the course of a detention, we must deter-

---

**4.** Although the district court did not address this issue because it held that the seizure was not justified at its inception, we must uphold the district court's ultimate ruling "if there is any reasonable view of the evidence to support it." *United States v. Neu,* 879 F.2d 805, 807 (10th Cir.1989). *See also United States v. Morgan,* 936 F.2d 1561, 1565 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431

(1992). Given that the evidentiary record before us is well developed, and the "ultimate determination of reasonableness under the Fourth Amendment" is a question of law, *United States v. Walker,* 941 F.2d 1086, 1090 (10th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992), we see no purpose in remanding to the district court for resolution of this issue.

mine whether Officer LeMasters' failure to use less intrusive means was unreasonable. *Sharpe*, 470 U.S. at 686–87, 105 S.Ct. at 1575–76.

Notwithstanding our reluctance to "indulge in 'unrealistic second-guessing'" of police officers in determining whether a seizure was reasonably related in scope to its justification, *Montoya de Hernandez*, 473 U.S. at 542, 105 S.Ct. at 3311 (quoting *Sharpe*, 470 U.S. at 646, 105 S.Ct. at 1563), we hold that Officer LeMasters' failure to use less intrusive means to ensure her safety while advising King to cease honking was unreasonable. The traffic hazard King presented, which was the basis for the detention, was alleviated when King ceased honking and explained himself prior to Officer LeMasters' observation of the pistol; nonetheless, Officer LeMasters had the right to explain the situation to King and ensure that he would not continue to present a traffic hazard. Once she saw the gun, Officer LeMasters could separate Defendants from the gun for her own safety by ordering Defendants out of the car. However, Officer LeMasters' conduct, as noted above, went far beyond what was necessary to ensure her safety while advising Defendants of the hazardous traffic conditions. Officer LeMasters initiated what was essentially an arrest procedure.[5] *See United States v. Maez*, 872 F.2d 1444, 1450–51 (10th Cir.1989) (defendants were effectively arrested when police surrounded house and ordered them to come out). Under the facts presented here, Officer LeMasters' conduct was not "reasonably related in scope to the circumstances which justified the interference in the first place," *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879, and went far beyond what was necessary to protect her safety.[6] Accordingly, the sei-

zure of Defendants was unreasonable in violation of the Fourth Amendment.

### III.

▮ Having determined that Officer LeMasters' detention of Defendants was unreasonable under the Fourth Amendment, we turn to the question of whether the drugs which were discarded by Burdex were the fruit of the unlawful detention. In determining whether evidence discovered by the police following a Fourth Amendment violation is "fruit of the poisonous tree" and therefore subject to the exclusionary rule, the question is "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 488, 9 L.Ed.2d 441 (1963) (quotations omitted). Because the issue is fact intensive, *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); *United States v. Ward*, 961 F.2d 1526, 1535 (10th Cir.1992), we review the district court's finding under a clearly erroneous standard.

The government contends that Burdex voluntarily abandoned the drugs, and this act was a sufficient intervening circumstance to purge the taint of the Fourth Amendment violation. In determining whether "the evidence to which the instant objection is made has been come at by exploitation of th[e] illegality or instead by means sufficiently distinguishable to be purged of the primary taint," *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417, several factors guide our inquiry including the

---

5. In a state, other than New Mexico, where it is illegal to transport firearms in the passenger compartment of a car, Officer LeMasters, upon observing the pistol, would have had probable cause to arrest Defendants, and, therefore, her actions would have been reasonable.

6. In *United States v. Merritt*, 695 F.2d 1263 (10th Cir.1982), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983), we held that the fact that officers approached the defendant with guns drawn and pointed at him did not render

the *investigative* detention unreasonable. *Id.* at 1273. In *Merritt*, the officer's actions were reasonable in light of the officer's suspicion that the defendant was an armed and dangerous murder suspect. *Id.* at 1274. In contrast, we consider similar actions by Officer LeMasters to be unreasonable because the justification for the detention was merely to ensure her safety while advising a lawfully armed motorist to cease honking his horn.

"temporal proximity" of the Fourth Amendment violation and Burdex's discarding of the evidence, any "intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2262 (citations and footnotes omitted). *See also Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). Moreover, when, as here, the government asserts that an act by the defendant purges the taint of the illegality, the voluntariness of the defendant's act is a "threshold requirement." *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. *See also Ward*, 961 F.2d at 1535 ("[W]hen an alleged abandonment follows a Fourth Amendment violation, the issue is whether the abandonment of property was voluntary.").

Considering these factors, we cannot say that the district court's finding that the drugs were the fruit of the unlawful detention is clearly erroneous. Given that Burdex discarded the drugs during the course of the unlawful seizure, and Officer Armijo almost immediately retrieved the drugs after being alerted by a bystander, the "temporal proximity" between the Fourth Amendment violation and Burdex's discarding of the evidence weighs heavily in support of a finding that the drugs were the fruit of the unlawful seizure. *See Brown*, 422 U.S. at 604, 95 S.Ct. at 2262 (confession which came two hours after illegal arrest held to be fruit); *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416 (statement made immediately after unlawful arrest held to be fruit). Moreover, Officer LeMasters' conduct here came very close to approaching an arrest for which there was no probable cause; thus, "the flagrancy of the official misconduct" also weighs in favor of a finding that the drugs were the fruit of an unlawful seizure.

 Furthermore, we disagree with the government's suggestion that Burdex's act of discarding the drugs constituted a voluntary abandonment which is a sufficient intervening circumstance to purge the taint of the Fourth Amendment violation. A confession by a defendant during an illegal detention is not an intervening circumstance which purges the taint of a Fourth Amendment violation. *See Dunaway*, 442 U.S. at 219, 99 S.Ct. at 2260; *Brown*, 422 U.S. at 604, 95 S.Ct. at 2262. Likewise, " '[a]bandonment will not be recognized when it is the result of illegal police conduct.' " [7] *Ward*, 961 F.2d at 1535 (quoting *United States v. Brady*, 842 F.2d 1313, 1315 n. 7 (D.C.Cir.1988)). In *United States v. Newman*, 490 F.2d 993 (10th Cir. 1974), two containers holding marijuana fell out of the back of the defendants' truck as they unexpectedly drove off during an unlawful search. We held that the initial illegal intrusion "tainted all subsequent events leading to the ultimate seizure of the marijuana," and therefore "contraband evidence was inadmissible as the 'fruit of the poisonous tree.' " *Id.* at 995. Similarly, in *United States v. Borcich*, 460 F.2d 1391 (10th Cir.1972), the defendants were unlawfully seized on a remote highway. One of the defendants was ordered to drive his truck between the two police cars to the nearest city which was over 100 miles away. As they approached the city, the defendant driving the truck threw a small container from the window, which the officers recovered and found to contain marijuana. We held that the marijuana was the fruit of the illegal detention, and that the primary taint had not been purged by the considerable lapse of time during the 100 mile journey. *Id.* at 1394. *See also United States v. Beck*, 602 F.2d 726, 730 (5th Cir.1979) (defendant's discarding

---

7. The government's reliance on *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), *United States v. Morgan*, 936 F.2d 1561 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992), and *United States v. Jones*, 707 F.2d 1169 (10th Cir.), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983), is misplaced because in these cases, the items seized were abandoned prior to any unlawful seizure of the defendants.

Because the defendants were not unlawfully seized prior to discovery of the evidence which the defendants sought to suppress, none of these cases considered whether the defendants' acts in abandoning the evidence were "sufficiently a product of free will to break ... the causal connection between the illegality" and the discovery of the evidence. *Brown*, 422 U.S. at 590, 95 S.Ct. at 2255.

of marijuana cigarette upon being unlawfully seized was not voluntary abandonment sufficient to purge taint). In short, it was not clearly erroneous for the district court to find that Burdex's discarding of the drugs during the course of the unlawful detention was not "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416 (suppressing defendant's statement immediately following illegal arrest).

AFFIRMED.

ANDERSON, J., concurs in the judgment only.