UNITED STATES of America,
Plaintiff,

v.

Sergei NOVITSKY, Defendant.

No. CR. A. 01–CR–291–WM.

United States District Court,
D. Colorado.

July 1, 2002.

George E. Gill, Gregory E. Goldberg, U.S. Attorney's Office, Denver, CO, for U.S.

Janine Yunker, Fed. Public Defenders Office, Denver, CO, Harvey Abe Steinberg, Springer & Steinberg, P.C., Denver, CO, Kenneth Frank Eichner, Eichner Law Firm, Denver, CO, for defendant.

## AMENDED ORDER ON MOTIONS TO SUPPRESS

MILLER, District Judge.

This case is before me on defendant's motions to suppress the firearm seized on June 9, 2001, and his statements made on that date to two Aurora police officers. For the reasons that follow, I conclude that the seizure of the firearm was unreasonable and that the statement that the handgun was a "toy," although a voluntary utterance and not the result of custodial interrogation, must likewise be suppressed.

### Background

Defendant Sergei Novitsky is charged in a one-count indictment with possession of a firearm by a convicted felon, a violation of 18 U.S.C. § 922(g). After two evidentiary hearings and partial trial testimony[1] on the pertinent issues, I make the following findings.

---

1. The first suppression hearing was held January 3, 2002. After the hearing, I denied the motion to suppress the firearm in an oral ruling. The evidence presented, over Novitsky's objection, was the hearsay testimony of ATF Agent Manuel Porter, based upon his conversations with, and review of the report of, the Aurora police officers who seized the handgun from Novitsky on June 9, 2001.

At approximately two o'clock in the afternoon of June 9, 2001, Aurora Police Officers Michael Wortham and Paul Marshall responded to a "down party" or "man down" call. Arriving at the scene, a YMCA parking lot, they found a parked car with the front passenger door open; a man in the front seat was hanging halfway out of the car. As the officers approached the car to ascertain whether any person was in need of medical or other attention, they noticed a second man apparently asleep or unconscious in the back seat.

While Officer Marshall remained near the rear passenger door of the car, Officer Wortham roused the man in the front seat and got him out of the vehicle. Officer Wortham noticed a strong odor of alcohol and that the man had difficulty standing; he did a quick pat-down search for weapons, then seated the man on the ground.

Officer Wortham then awoke the man in the back seat, later identified as defendant Novitsky, by knocking on the window and opening the rear passenger door. Although the officer had smelled alcohol in the car, he did not know if Novitsky was intoxicated. Officer Wortham directed Novitsky to get out of the car. Novitsky, who was lying in a fetal position on his left side with his feet toward the open door, reached up with his right hand as though to grasp the car door to help himself out. Officer Wortham reached into the car and gripped Novitsky's hand to assist him out of the vehicle, but primarily, as a matter of officer safety, to control his actions. He grasped Novitsky's hand in a "twist lock or escort position" and helped him out of the vehicle. May 31, 2002 Transcript, at 7.[2]

As described by Officer Wortham, the twist lock hold is an arrest control technique taught at the police academy; the officer using the hold grasps an individual by the hand and twists to tighten up the arm. Also known as a pain compliance hold, the hold permits the officer to twist the arm further in case the individual begins to fight or otherwise resist. *Id.* Because Novitsky did not resist, Officer Wortham did not apply any pressure beyond the basic twist lock position as he helped him out of the vehicle.

Officer Wortham had no indication that a crime had been committed, no suspicions that Novitsky had committed a crime, and no evidence that Novitsky presented any threat to the officers' safety. May 31, 2002 Transcript, at 14–15, 19. Despite this lack of suspicion, Officer Wortham placed Novitsky in a control hold with the intent of getting him out of the vehicle to perform a pat-down search. At that point in time, Novitsky was plainly under restraint, not free to walk away.[3]

A jury trial commenced April 8, 2002. Officer Marshall's testimony raised issues regarding the circumstances of the seizure of the firearm that had not been presented by Agent Porter's testimony at the January 2002 hearing. As a result of that and other issues, the parties agreed to a mistrial, and Novitsky was permitted to renew his suppression motion, including an oral motion to suppress his statement to the Aurora police officers to the effect that the firearm was a toy.

**2.** Citations to the transcript from the May 31, 2002 hearing are to a "real time" (unofficial) transcript.

**3.** On cross-examination, Officer Wortham testified as follows:

> Q: It's fair to say once you apply this control hold, the person is not free to leave? * * * He is not going to be able to walk away, right?
> A: No, because if he starts to struggle and stuff, then I am going to apply more pressure because I am trying to control his moving.
> Q: Right. The truth of the matter is once you put this hold on him, he is obligated to follow your direction. And if he doesn't, you are going to make it painful?
> A: Correct.

As Novitsky got out of the vehicle, Officer Wortham began to turn him to conduct a pat-down search and saw the butt-end of a handgun in Novitsky's right front pants pocket.[4]  Officer Wortham yelled "gun" to alert Officer Marshall.  In response to this alert, Novitsky exclaimed, "It's a toy, it's a toy."  The officers handcuffed Novitsky, patted him down, and retrieved a Smith & Wesson .44 caliber handgun from his pants pocket.  They issued Novitsky a summons for carrying a concealed weapon and released him.

Q:  And you applied this hold to him while he is in the back seat, correct?
A:  Yes, sir.
Q:  When you applied this hold to him, did you have any evidence that he committed a crime?
A:  No, sir.
Q:  Did you have any suspicions that he committed a crime?
A:  No, sir, not at that time.
Q:  Had he resisted you in any way?
A:  No, sir.
Q:  Had he threatened you in any way?
A:  No, sir.
       *     *     *     *     *     *
Q:  You pulled him out of the car and your intent in doing that is to get him out of the car so you can do a pat-down immediately, correct?
A:  Correct.
Q:  You still don't have any evidence of a crime, correct?
A:  No, sir.
Q:  No suggestion a crime has been committed, correct?
A:  Yes, sir, that's correct.
Q:  No inference that a crime has been committed?
A:  Correct.
Q:  As far as you know, he is a citizen?
A:  Yes, sir.
Q:  In a car parked in a lot legally?
A:  Yes, sir.
Q:  You pull him out and then you physically turn him, correct?
A:  Correct.
Q:  And you are doing that by twisting his arm and telling him to turn around?
A:  Yes, sir.  * * *
May 31, 2002 Transcript, at 14–15, 19–20.

On June 26, 2001, ATF Agent Manuel Porter interviewed Novitsky, who was at the county jail in Castle Rock, Colorado, on unrelated charges.  After being advised of his *Miranda* rights, Novitsky stated that he understood the rights and signed a waiver to that effect.  He then admitted that he had a prior felony conviction and that he had been in possession of a firearm on June 9, 2001.[5]

### Discussion

Novitsky moves to suppress the firearm on the grounds that it was the fruit of an

Officer Marshall similarly had no evidence or suspicions regarding any threat posed by Novitsky:
Q:  Tell the Court all the evidence you have that would suggest that the defendant was armed before he was pulled out of the vehicle?
A:  Evidence, we had no evidence.
Q:  Tell the [Court] all the suspicions that you had.
A:  The suspicions are that the party was [lying] down in the back seat, and we didn't have any idea who he was, what he was doing or what may be in the vehicle.

       *     *     *     *     *     *
Q:  And you had no indication whatsoever that any crime had been committed?
A:  Correct.
Q:  When you arrived at the scene, there was nothing at the scene that suggested to you a crime had been committed?
A:  No, sir, there wasn't.

       *     *     *     *     *     *
Q:  You had absolutely not one scintilla of evidence that Mr. Novitsky might be armed, correct?
A:  Correct.
*Id.*, at 35, 36, 38.

4.  At the January 3, 2002 hearing, Novitsky testified that the firearm was found during the pat-down search.  I resolve this factual dispute in favor of Officer Wortham's version.

5.  Counsel agreed at the motions hearing that matters decided with this order do not implicate my January 3, 2002 ruling denying the motion to suppress Novitsky's statements to Agent Porter on June 26, 2001.

unlawful seizure and search. Specifically, he challenges Officer Wortham's actions in applying the twist hold and in turning him to conduct a pat-down search in the absence of any articulable suspicion that a crime had been committed or that Novitsky presented a danger to the officers' safety.

The Fourth Amendment upholds an individual's right "to be secure ... against unreasonable searches and seizures[.]" U.S. CONST. amend. IV. "[A] person is seized for Fourth Amendment purposes when, considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *United States v. King*, 990 F.2d 1552, 1556 (10th Cir.1993) (citations omitted). *See also Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person").

*Terry* provides the analytical framework for this case. Under *Terry*, a police officer may, in certain circumstances, detain a person, for the purpose of investigation on less than probable cause and, if appropriate, conduct a protective search for weapons for the officer's protection. *King*, 990 F.2d at 1557. The reasonableness inquiry for the detention and the protective search is twofold: the officer's action must be "justified at its inception" and it must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (quoting *Terry*, 88 S.Ct. at 1879).

To justify an intrusion, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 88 S.Ct. at 1880. A protective search is justified at its inception if the officer "harbor[s] an articulable and reasonable suspicion that the person is armed and dangerous" and if the officer is entitled to make a forcible stop. *King*, 990 F.2d at 1557. In making these determinations, I must judge the facts "against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 88 S.Ct. at 1880.

Here, the officers' investigation of the "man down" call, to the extent of their conduct in ascertaining whether the occupants of the car were under the influence of alcohol or drugs, in need of medical aid, or otherwise presenting a community concern, is not in question. The Supreme Court has recognized that police officers frequently investigate circumstances "in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973).[6] Novitsky concedes the propriety of the officers' actions in approaching the car and contacting the occupants to determine whether they were in need of medical help or other assistance.

---

6. The Tenth Circuit has indicated that, in the context of warrantless searches, the community caretaking exception is limited to cases involving automobile searches. *United States v. Bute*, 43 F.3d 531, 535 (10th Cir.1994). This limitation does not apply here, both be-

cause the parties' agree that the officers acted properly in approaching the vehicle and because the seizure and search in this case fall under the rubric of *Terry v. Ohio* rather than search warrant cases.

The crux of this case is whether Officer Wortham acted reasonably in applying the twist hold to Novitsky and in controlling his exit from the car with the intent of performing a pat-down search of his person. Novitsky contends the officer's actions exceeded the scope of his community caretaking function because there was no evidence or suspicion that a crime had been committed or that Novitsky posed a threat to the officers' safety.

The government relies on an isolated statement in *King* to justify the twist hold and the intended pat-down search. In the context of determining whether a police officer acted properly in approaching a vehicle in the course of investigating a traffic accident, the Tenth Circuit stated:

> In the course of exercising this noninvestigatory [community caretaking] function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, *regardless of any suspected criminal activity.*

*King,* 990 F.2d at 1560 (emphasis added).

The government seems to argue that the italicized language describes an exception to the requirement of *Terry* that the officers have an articulable and reasonable suspicion of a threat to their safety before conducting a frisk. Neither the remainder of the court's analysis, the cases relied upon, nor the result in *King* support this interpretation. Indeed, despite finding that the police officer had a reasonable and articulable basis to detain the defendant to advise him to cease honking his horn and that the officer was entitled to separate the defendant from the pistol in plain view in his vehicle, the *King* court held that the officer acted unreasonably when she ordered the defendant out of his vehicle at gunpoint and threatened to shoot him if he did not comply. In addition, the officer's

call for backup assistance resulted in other officers encircling defendant's car with their weapons drawn; one officer ordered him to his knees while the first officer handcuffed him. *Id.* at 1562.

Indeed, the full context in which the *King* court made the quoted statement demonstrates that the requirements of *Terry* still apply. The *King* court explained that the officer need not suspect the individual of a crime because *Terry* "only requires 'specific and articulable facts which ... reasonably warrant [an] intrusion into the individual's liberty.' " *Id.* at 1560 (quoting *Terry,* 88 S.Ct. at 1880; alterations in quoted material). The *King* court went on to state:

> However, a person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity for "[i]t is surely anomalous to say that the individual ... [is] fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." ... Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference.

*Id.* (citation omitted; alterations in quoted material).

Further, the cases relied upon in *King* involve circumstances in which the officer had reason to believe the individual was armed or otherwise had an articulable and reasonable suspicion that the person posed a threat to the officer's safety. *See, e.g., United States v. Rideau,* 969 F.2d 1572

(5th Cir.1992) (*en banc*) [7]; *United States v. Wallace*, 889 F.2d 580 (5th Cir.1989).

Other decisions of the Tenth Circuit reveal that *Terry*'s requirement of a reasonable and articulable suspicion still governs the reasonableness of a pat-down search. *See, e.g., United States v. Hishaw*, 235 F.3d 565, 570 (10th Cir.2000) ("Even though the initial stop was justified, we must still assess the reasonableness of the subsequent pat-down search. In order to comport with the Fourth Amendment, that search must have been 'reasonable related in scope' to the basis for the stop .... In that regard, this circuit has concluded that an officer may conduct a pat-down search ... if he or she 'harbors and articulable and reasonable suspicion that the person is armed and dangerous' "); *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir.1996) ("In the course of a valid investigative detention, an officer may conduct a limited protective search ... if the officer harbors an articulable and reasonable suspicion that the person is armed and dangerous").

Accordingly, despite any conclusion that the officers acted properly in investigating the "man down" call, I must still determine whether the officer's use of a control hold to turn Novitsky to conduct a pat-down search was reasonable.[8]

Given the unequivocal testimony by both officers that they had no evidence that a crime had been committed, no suspicions that Novitsky was engaged in criminal behavior, and no reason to believe he was armed or otherwise presented a threat to their safety, I must conclude that the action exceeded the reasonable scope of their investigative protective functions. Without any evidence or suspicion that Novitsky had committed a crime or that he was armed, Officer Wortham applied and maintained an arrest control hold as he drew the defendant out of the vehicle and turned him to begin the pat-down search. At that point in time Novitsky was under the control of the officer and not at liberty. Balancing the officers' need to check out the situation and Novitsky's interest in being free from government intrusion, that seizure was unreasonable under the circumstances.

Because the officers discovered the firearm only after the Fourth Amendment violation occurred, the firearm must be suppressed.[9]

With regard to the oral motion to suppress Novitsky's statement that the gun was a "toy," I conclude the statement, although not made in response to custodial interrogation, should be suppressed as the direct and immediate result of an illegal

---

**7.** The *King* decision cited to the panel opinion in *Rideau*, 949 F.2d 718 (5th Cir.1991), which was reversed *en banc*. The full court determined that a protective pat-down was reasonable, under the circumstances, because the defendant's conduct gave the officer reason to fear he might be armed. 969 F.2d at 1574–75.

**8.** Regrettably, both officers testified that Aurora policy was to conduct pat-down searches at almost any *Terry* (or equivalent) stop without an articulable suspicion of weapons or other threat to officers or the public.

**9.** To the extent the government might have relied on an argument similar to the "plain view" doctrine, this argument is foreclosed by *United States v. Davis*, 94 F.3d 1465, 1470 (10th Cir.1996). "The first and most fundamental prerequisite to reliance upon plain view as a basis for a warrantless seizure ... is that 'the initial intrusion which brings the police within plain view of such an article' is itself lawful." (Quotations omitted.)

Importantly, I make no finding at this stage regarding whether the discovery of the firearm was inevitable or whether the taint of the Fourth Amendment violation was sufficiently attenuated by June 26, 2001, when Novitsky was interviewed by the ATF and admitted to possession of a firearm and his status as a convicted felon.

seizure that cannot be separated or attenuated by a *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), analysis.

Accordingly, it is ordered:

1. Defendant's motion to suppress the firearm seized June 9, 2001, is granted.

2. Defendant's oral motion to suppress the "toy" statement made June 9, 2001, is granted.

3. Counsel shall contact chambers on or before June 18, 2002, to schedule a status conference.