# IN THE SUPREME COURT OF IOWA

No. 11–0525

Filed May 11, 2012

**STATE OF IOWA,**

Appellee,

vs.

**JEFFREY DANA KURTH,**

Appellant.

Appeal from the Iowa District Court for Polk County, William A. Price, Judge.

The defendant appeals his conviction for operating a motor vehicle while under the influence of alcohol, arguing the district court erred in denying his motion to suppress. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Robert G. Rehkemper of Gourley, Rehkemper & Lindholm, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, Benjamin M. Parrott, Assistant Attorney General, John P. Sarcone, County Attorney, and David M. Porter, Assistant County Attorney, for appellee.

**MANSFIELD, Justice**.

This case presents the question whether an officer is justified in activating his emergency lights and blocking a driver into a parking space under the "community caretaking function" exception to the warrant requirement of the Fourth Amendment based solely upon his knowledge that the vehicle has just struck an object in the roadway and suffered minor damage not affecting the drivability of the car. We conclude that under these circumstances, the community caretaking exception is inapplicable, and the seizure was impermissible. For this reason, we reverse the judgment of the district court and remand this case.

## I.  Factual Background and Procedural History.

On November 28, 2010, at about 2:00 a.m., Officer Adam Jones and Officer Trent Weiler of the Clive Police Department had parked their vehicles and were talking in the lot of a grocery store near 8700 Hickman Road in Clive. Officer Jones was working a special traffic enforcement detail funded by the Governor's Traffic Safety Bureau. Officer Jones heard a loud crash, which sounded like metal-on-metal contact, coming from nearby on Hickman Road. He testified at the suppression hearing that when he looked over toward the direction of the sound he saw an Infiniti sedan approximately 50 yards away, traveling east, and "enveloped in a cloud of dust or smoke." The defendant, Jeremy Kurth, was driving the vehicle.

Believing that the vehicle might have struck a road sign, Officer Jones proceeded after the vehicle and observed a road sign down in the left eastbound lane of Hickman Road. He then pulled behind the vehicle, which was stopped at a red light in the left-turn lane and waiting to turn north onto 86th Street. Officer Jones testified that at this time he was

still unsure whether the vehicle had knocked down the sign or if the sign had already been down in the roadway when the vehicle struck it. However, he also stated that Kurth's vehicle could not have knocked the sign down from the median because his car was at all times in its own lane. Officer Jones further testified that at this time, traffic was light, and no other cars were in the vicinity. The vehicle turned left onto 86th Street, circled around a strip mall, and entered the parking lot of a restaurant. While Officer Jones followed the vehicle, the following conversation took place between him and Officer Weiler over their radios:

Officer 73 (Jones): Did he just hit a sign or something?

Officer 78 (Weiler): Don't know, he was just in the lane.

Officer 78 (Weiler): Yeah, he did.

Officer 73 (Jones): Well, there's a sign down here, I don't know if he knocked it down, but he hit it.

Officer 78 (Weiler): I don't think he hit it, I think it was already there, in the roadway.

Officer 73 (Jones): 78?

Dispatch: Go 73.

Officer 73 (Jones): I'm still behind that guy, what do you think?

Officer 78 (Weiler): I would say it's your call depending on how he's driving. He was driving down Hickman, and it was like he was just in his lane, then he just hit the sign laying there.

Officer 73 (Jones): Copy. Yeah, he's going into Perkin's. Westcom copy a plate traffic stop.

Dispatch: Go ahead.

Officer 73 (Jones): [Reading the license plate number aloud], he has damage to his front end from hitting the sign—I don't know if he's aware of it.

Dispatch: 10–4.

Kurth pulled into a parking space at the restaurant and lawfully parked the vehicle of his own volition; Officer Jones did not attempt to stop the vehicle. Officer Jones testified that he never observed Kurth commit any traffic violations and that he had no reason to suspect that any occupant of the vehicle (including its female passenger) was engaged in any type of criminal activity. Officer Jones confirmed that the vehicle was drivable at all times.

Once the vehicle was parked, Officer Jones pulled around Kurth and saw that the vehicle had sustained damage to the front fascia which he characterized as not significant. At that point he activated his emergency lights and blocked in Kurth's vehicle. Officer Jones testified that from this time forward the vehicle and its occupants were not free to go. Officer Jones approached Kurth and proceeded to have a conversation with him about the damage to the front of his vehicle. According to Officer Jones, when he showed Kurth the damage, Kurth became very upset and said he did not know how the damage had occurred.

During this conversation, Officer Jones detected an odor of an alcoholic beverage, Kurth's speech was slurred, and his eyes were glossy and bloodshot. Kurth admitted that he was driving from a bar where he had consumed alcohol. Kurth agreed to participate in standardized field sobriety testing. Three field sobriety tests indicated Kurth was intoxicated, as did a preliminary breath test. Officer Jones placed Kurth under arrest. A subsequent Datamaster breath test showed a blood alcohol content of .222%, nearly three times the legal limit.

On January 5, 2011, the State filed a trial information charging Kurth with operating a motor vehicle under the influence of alcohol (OWI), a serious misdemeanor in violation of Iowa Code section 321J.2

(2011). Kurth filed a timely motion to suppress asserting the stop of his vehicle had been unlawful. The State resisted the motion to suppress on the grounds that the warrantless seizure of Kurth's vehicle was justified under the community caretaking exception to the warrant requirement. Following a hearing at which Officer Jones testified and the recording of his conversation with Officer Weiler was played, the district court denied Kurth's motion to suppress. The matter proceeded to trial on the minutes of testimony the same day, and the district court found Kurth guilty of OWI. Kurth was sentenced to one year in jail with all but two days suspended, probation, and a fine. Kurth now appeals, urging the district court erred in denying his motion to suppress.

## II.  Standard of Review.

Kurth argues the stop of his vehicle violated his constitutional rights under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. "In considering alleged violations of constitutional rights, our standard of review is de novo." *State v. Krogmann,* 804 N.W.2d 518, 522 (Iowa 2011) (citing *State v. Lyman,* 776 N.W.2d 865, 873 (Iowa 2010)). " '[W]e make an independent evaluation [based on] the totality of the circumstances as shown by the entire record.' " *Id.* at 522–23 (quoting *State v. Brooks,* 760 N.W.2d 197, 204 (Iowa 2009)). " 'Each case must be evaluated in light of its unique circumstances.' " *Id.* at 523.

## III. Analysis.

Kurth challenges the warrantless stop of his vehicle. He maintains there was no reason to believe he had violated any traffic regulation or any other law at the time of the stop and, accordingly, his constitutional rights were violated. The State responds that the stop of Kurth's vehicle

was justified under the community caretaking exception to the warrant requirement of the Fourth Amendment.

The community caretaking exception can be traced to the United States Supreme Court's decision in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706, 714–15 (1973). That case involved a warrantless search of the trunk of a damaged car that had been towed from the scene of an accident to a private facility. *Cady*, 413 U.S. at 442–43, 93 S. Ct. at 2528–29, 37 L. Ed. 2d at 715. Local Wisconsin law enforcement believed that the intoxicated and comatose driver, a Chicago police officer, was required to carry his service revolver at all times, and they had not found the revolver on his person. *Id.* at 436–37, 93 S. Ct. at 2525–26, 37 L. Ed. 2d at 711–12. Therefore, following a standard procedure, they searched the trunk of the impounded vehicle to protect the public from the possibility that the revolver would fall into someone else's hands. *Id.* at 443, 93 S. Ct. at 2529, 37 L. Ed. 2d at 716. During that search, local police did not find the revolver, but obtained other evidence that was later used to convict the driver of first-degree murder. *Id.* at 434, 437, 93 S. Ct. at 2525, 2526, 37 L. Ed. 2d at 710, 712.

The Supreme Court held the warrantless search in *Cady* was lawful as a "caretaking" search based upon "concern for the safety of the general public who might be endangered if an intruder removed a revolver from the trunk of a vehicle." *Id.* at 447, 93 S. Ct. at 2531, 37 L. Ed. 2d at 718. The Court explained that local police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441, 93 S. Ct. at 2528, 37 L. Ed. 2d at 714–15.

The Court concluded that searches made in the performance of community caretaking functions do not require warrants and are subject to "only the general standard of 'unreasonableness' as a guide in determining" constitutionality. *Id.* at 448, 93 S. Ct. at 2531, 37 L. Ed. 2d at 718. The Court also stated that "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 447, 93 S. Ct. at 2531, 37 L. Ed. 2d at 718 (citing *Chambers v. Maroney*, 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970)).

Since *Cady* was decided nearly forty years ago, the Supreme Court has continued to address warrantless seizures and searches in numerous contexts but has said relatively little to clarify the scope of the community caretaking exception. As one commentator has observed, "The core of the community-caretaking doctrine . . . —where police act to protect or assist the public—has been left with little doctrinal guidance from the Supreme Court other than the vague command of reasonableness." Michael R. Dimino, *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1490 (2009); *see also Tinius v. Carroll Cnty. Sheriff Dep't*, 321 F. Supp. 2d 1064, 1075 (N.D. Iowa 2004) (observing that "[i]n community caretaking cases, as elsewhere, reasonableness has a fluid quality"). Elaboration of the doctrine has been left to other courts, especially state courts. This latter development is not surprising in light of the fact that community caretaking is generally the role of local police rather than federal officers. *See Cady*, 413 U.S. at 441, 93 S. Ct. at 2528, 37 L. Ed. 2d at 714.

In a number of decisions, our court has also recognized the community caretaking function as a valid exception to the Fourth

Amendment's warrant requirement. *See, e.g.*, *State v. Moore*, 609 N.W.2d 502, 503–04 (Iowa 2000) (holding that a park ranger properly exercised a public safety function when he stopped the defendant's vehicle to warn him that his speed posed a danger to park campers even in the absence of a criminal violation); *State v. Carlson*, 548 N.W.2d 138, 139–40, 143 (Iowa 1996) (holding that the warrantless entry of an officer into a home to investigate a missing person's report was justified under the "totality of the circumstances" based on the related emergency aid exception where the defendant gave conflicting stories about the disappearance of his live-in girlfriend and had a history of domestic abuse); *State v. Mitchell*, 498 N.W.2d 691, 693–94 (Iowa 1993) (holding that a trooper had a legitimate public safety responsibility to stop defendant to inform him of burned-out taillight even though it was not a traffic violation at the time). As we said recently in *State v. Wilkes*:

> In the event evidence was obtained pursuant to a seizure prior to reasonable suspicion that a criminal offense may have been committed, the police may have acted properly if the seizure amounted to a "community caretaking activity." Such seizures have been held not to violate the Fourth Amendment if the interest in community welfare outweighs any invasion of privacy that accompanies the seizure. If, however, the conduct of Wood and the reserve officer amounted to a seizure and their actions do not amount to a valid community welfare check, a violation of the Fourth Amendment is present and the evidence obtained pursuant to the unlawful conduct must be suppressed.

756 N.W.2d 838, 842 (Iowa 2008) (citations omitted).

Our most extensive discussion of the community caretaking exception appears in *State v. Crawford*, 659 N.W.2d 537 (Iowa 2003). There we upheld a stop under that exception, finding that an officer's decision to pull over the defendant's truck in the interest of public safety

and emergency aid was justified. *Crawford*, 659 N.W.2d at 543–44. The officer in that instance had received a report informing him that a man

> had taken "some pills" either before going to sleep or after waking up. When he awoke he was agitated and was "physically aggressive" to a woman in her apartment. The man was confused, stating that he did not know where he was and that he wanted the police to take him home. The man abruptly left in a Ford flatbed truck.

*Id.* at 543. The officer also knew that the man might have been driving the truck. *Id.* Under these circumstances, we concluded that the officer's action "was model police conduct, deserving of commendation, and not condemnation." *Id.* (quoting *Carlson*, 548 N.W.2d at 143). We also noted "that the community caretaking exception encompasses three separate doctrines: (1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception noted in *Cady*." *Id.* at 541.

*Crawford* was decided under the Fourth Amendment. *Id.* at 543. In *State v. Tague*, on the other hand, we found a violation of article I, section 8 of the Iowa Constitution where a 2 a.m. traffic stop was based only on an "isolated incident of [the driver] briefly crossing an edge line of a divided roadway." 676 N.W.2d 197, 205–06 (Iowa 2004).[1] The State argued that the stop was justified because of reasonable suspicion the driver was intoxicated or, alternatively, as a community caretaking effort to assist a potentially fatigued driver. *Id.* at 204. We acknowledged that the "State charges local police officers with duties that go beyond investigating and enforcing the criminal laws." *Id.* (citing *Cady*, 413 U.S. at 441, 93 S. Ct. at 2528, 37 L. Ed. 2d at 714–15). However, we

---

[1]Although we based our decision in *Tague* on the Iowa Constitution, we cited considerable precedent under the United States Constitution. We also did not explain how, if at all, the analysis would have differed under the Fourth Amendment. *Tague*, 676 N.W.2d at 204–05.

concluded that under the totality of the circumstances the warrantless stop of the driver could not be justified by the community caretaking function. *Id.* at 205–06. We noted that many circumstances could lead to a vehicle momentarily crossing the center line other than intoxication or fatigue. *Id.* at 205.

The United States Court of Appeals for the Eighth Circuit has also applied the community caretaking exception in cases involving vehicle stops. In *Winters v. Adams,* a civil claim was brought alleging unreasonable seizure and excessive use of force in violation of Fourth Amendment rights. 254 F.3d 758, 760 (8th Cir. 2001). The officers there had responded to a report that an unknown person "was possibly intoxicated and was observed exiting and reentering a vehicle that was parked on a dead-end street" in a residential area. *Id.* When the officers arrived to investigate, they observed Winters "seated behind the wheel of a car parked in the location matching the described location of the vehicle." *Id.* As they approached the vehicle, Winters "raised the car window, locked the door and stated that he wished to be left alone." *Id.* Winters appeared "agitated" and "extremely hyper." *Id.* at 761. Thereafter, he "began moving 'wildly' about the car" and yelled at the officers. *Id.*

Although the officers had not observed any criminal activity, they "began to suspect that [Winters had] 'ingested or used some type of illegal drug and maybe used too much and was overdosing.'" *Id.* Eventually, the officers broke a window to gain access to the vehicle and, after a struggle, took Winters into custody. *Id.* at 761–62. The Eighth Circuit held that the officers' conduct in forcibly seizing Winters was justifiable because the " 'officers [we]re not only permitted, but expected, to exercise what the Supreme Court has termed "community caretaking

functions." ' " *Id.* at 763 (citations omitted). The court explained that the officers "would have been derelict in their duties had they not detained" Winters. *Id.* at 764 (citation and internal quotation marks omitted).

In reaching its conclusion in *Winters*, the Eighth Circuit relied on the reasoning set forth in *United States v. King*, 990 F.2d 1552, 1560 (10th Cir. 1993), and *United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir. 1992). In *King,* an officer responded to the scene of a traffic accident to find a driver in the resulting traffic jam honking incessantly. 990 F.2d at 1555. The Tenth Circuit held that the officer was "clearly exercising her 'community caretaking function' when she approached Defendants' car during the course of her investigation" because the driver's conduct "created [a] specific, articulable basis for [the officer] to believe that he might cause a second accident." *Id.* at 1560–61.

The *King* court elaborated:

> In the course of exercising [the community caretaking,] noninvestigatory function, a police officer may have occasion to seize a person, as the Supreme Court has defined the term for Fourth Amendment purposes, in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.

*Id.* at 1560. However, the court went on to note that there are limits to an officer's authority under the community caretaking function. *Id.* "[A] person's Fourth Amendment rights are not eviscerated simply because a police officer may be acting in a noninvestigatory capacity . . . ." *Id.*

> Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her "community caretaking function" and the individual's interest in being free from arbitrary government interference.

*Id.* (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 2578, 45 L. Ed. 2d 607, 614–15 (1975); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1879–80, 20 L. Ed. 2d 889, 905–06 (1968)).

In *Rideau*, the Fifth Circuit upheld the stop of a pedestrian, who was possibly drunk, wearing dark clothing, and stumbling in the road at night in a high-crime area, on the grounds he presented a potential hazard to himself and others. 969 F.2d at 1573. In concluding that the officers were justified in detaining the individual, the Fifth Circuit relied on the ABA Standards for Criminal Justice, Standard § 1–2.2, at 31–32 (2d ed. 1980), which states that "officers must 'aid individuals who are in danger of physical harm,' 'assist those who cannot care for themselves,' and 'provide other services on an emergency basis.' " *U.S. v. Rideau*, 949 F.2d 718, 720 (5th Cir. 1991), *reversed on other grounds by Rideau*, 969 F.2d at 1575.

In *United States v. Collins*, the Eighth Circuit again found that police conduct to protect the community did not violate the Fourth Amendment. 321 F.3d 693, 695 (8th Cir. 2003). There, two police officers responding to a "shots fired" call came upon a parked car in the area where the shots had been heard. *Id.* at 693. The officers observed two men slumped over in the front seat and leaned into the vehicle to determine whether it "was a crime scene or if [anyone] had been shot." *Id.* At that point, one officer observed a firearm and arrested the suspect. *Id.* The Eighth Circuit held that under the circumstances, "it was entirely reasonable for [an officer] to lean into the vehicle to confirm that the men were not injured." *Id.* at 695. The court explained that a failure by the officers to find out whether one of the men was in need of immediate aid "would have been irresponsible and, quite possibly, a basis for civil liability had the individuals in fact been injured." *Id.*

While the court in *Collins* did not explicitly state that it was relying on the community caretaking function exception, the court's reasoning was based on a recognition that one of a police officer's responsibilities is "to respond to emergency situations." *Id.* at 694–95. Furthermore, the Eighth Circuit's opinion acknowledged the community caretaking function exception and cited applicable precedents under it. *Id.* (citing *United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000), *overruled by Brigham City v. Stuart*, 547 U.S. 398, 403–04, 126 S. Ct. 1943, 1947–48, 164 L. Ed. 2d 650, 657–58 (2006); *United States v. Selberg*, 630 F.2d 1292, 1295 (8th Cir. 1980)).

In another Eighth Circuit case, *United States v. Smith*, an officer's conduct was again found not to violate the Fourth Amendment. 162 F.3d 1226, 1226–27 (8th Cir. 1998). There, the officer had been dispatched to the scene of a single car accident around midnight. *Id.* at 1226. When the officer arrived, the defendant "was standing beside his car, which was partially in a ditch and partially in the roadway." *Id.* While the defendant was retrieving the papers needed by the officer to prepare an accident report, the officer observed a gun pouch on the floor of the car. *Id.* The officer searched the car and seized the gun; the defendant was then charged with being a "felon in possession of a firearm." *Id.* The court cited *King* and *Cady* in concluding that the "officer lawfully approached [the defendant's] vehicle to investigate the traffic accident in the officer's community caretaking capacity." *Id.* (citing *Cady*, 413 U.S. at 441, 93 S. Ct. at 2528, 37 L. Ed. 2d at 715; *King*, 990 F.2d at 1560–61).

Our court has employed a three-step analysis in evaluating community caretaking cases:

> (1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?

*Crawford,* 659 N.W.2d at 543 (citing *State v. Anderson,* 417 N.W.2d 411, 414 (Wis. Ct. App. 1987)).

Every community caretaking case must be assessed according to its own unique set of facts and circumstances because reasonableness is not a term that can be usefully refined "in order to evolve some detailed formula for judging cases." *Cady,* 413 U.S. at 448, 93 S. Ct. at 2531, 37 L. Ed. 2d at 718; *accord United States v. LaFrance,* 879 F.2d 1, 6 (1st Cir. 1989) (stating that "what is reasonable in one type of situation may not be reasonable in [an]other"). "To establish 'reasonableness,' the state has the burden of 'showing specific and articulable facts that indicate their actions were proper.'" *Crawford,* 659 N.W.2d at 542 (quoting *Carlson,* 548 N.W.2d at 142). We have previously stated that we apply an objective standard considering "the circumstances confronting the police officer." *Id.*; *see also Tague,* 676 N.W.2d at 204; *Carlson,* 548 N.W.2d at 142; *Mitchell,* 498 N.W.2d at 693.

We now turn to the three-part analysis.

**A. Seizure.** "Implicit in any community caretaking case is the fact that there has been a seizure within the meaning of the Fourth Amendment. Otherwise there would be no need to apply a community caretaking exception." *Crawford,* 659 N.W.2d at 543. Here, once Kurth parked his vehicle, Officer Jones pulled in behind, blocked him in, and activated his emergency lights. Officer Jones testified that at this time the driver was not free to go. The State does not dispute that there was a seizure.

**B. Bona Fide Community Caretaking Activity.** Next we turn to the question whether Officer Jones's conduct constituted bona fide community caretaking activity. As noted, we have previously recognized three categories of such conduct: "(1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception noted in *Cady*." *Crawford*, 659 N.W.2d at 541.

This case did not involve an automobile impoundment or inventory. Therefore, only the emergency aid or the public servant doctrine could conceivably apply. "The two doctrines . . . are closely related." *Id.* As we noted in *Crawford*, assisting a motorist with a flat tire might be an example of the public servant doctrine, whereas "providing first aid to a person slumped over the steering wheel with a bleeding" head gash would fall under the emergency aid doctrine. *Id.* at 541–42 (citation and internal quotation marks omitted).

At the suppression hearing, Officer Jones testified that he heard a loud crash suggesting metal-on-metal contact and saw the vehicle driven by Kurth "enveloped in a cloud of dust or smoke." Believing that the vehicle might have struck a road sign, Officer Jones proceeded after the vehicle and noticed that a road sign was down in the left eastbound lane of Hickman Road. However, by the time Officer Jones decided to stop the vehicle, he and his fellow officer had concluded that the sign had been in the road before the driver struck it. Furthermore, Officer Jones testified that he never observed Kurth commit any traffic violations and that he had no reason to suspect any type of criminal activity. Additionally, the vehicle was completely drivable the entire time, and Officer Jones described the damage to the front end of the vehicle as not significant. By the time Officer Jones activated his emergency lights and blocked in

Kurth's car, Kurth had already driven the vehicle into the restaurant parking lot without incident and lawfully parked it in a parking space.

Upon our review, we find that Officer Jones's decision to activate his emergency lights and block in Kurth's parked vehicle exceeded the scope of bona fide community caretaking activity. We have previously emphasized that actions under that exception " 'must be limited to the justification thereof, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance.' " *Id.* at 542–43 (quoting *Carlson,* 548 N.W.2d at 142).

While Officer Jones might have been justified in stopping Kurth's moving vehicle immediately after the incident to advise him that he had struck a road sign and needed to inspect his car for damage, that is not what happened here. *See Mitchell,* 498 N.W.2d at 694 (holding that an officer was justified in stopping a vehicle under the community caretaking exception to advise the driver that his taillight was out); *see also State v. Harrison,* 533 P.2d 1143, 1144 (Ariz. 1975) (holding a state patrol officer could properly stop a vehicle in the exercise of his public safety duties when the vehicle was weaving somewhat on the highway and the left rear tire was "bouncing"); *State v. Fuller,* 556 A.2d 224, 224 (Me. 1989) (upholding a stop of a moving motor vehicle to advise the driver "to fix the headlights before getting stranded in the dark" where the vehicle approached the officer with its headlights blinking on and off, and the officer "reasonably suspected that [the defendant] may have been in trouble").

Rather, *after* Kurth had already parked his drivable vehicle, and *after* Officer Jones had ascertained that the damage was not significant, Officer Jones activated his emergency lights and blocked him in. We

believe the detention of Kurth, his passenger, and his vehicle at that point exceeded the scope of reasonably necessary community caretaking activity. Even if the officer wanted to tell Kurth to examine his parked vehicle for damage, it was not necessary to block in the vehicle to do so. All he needed to do was to park next to him and approach him. *Compare United States v. Gross*, 662 F.3d 393, 396, 401 (6th Cir. 2011) (holding that the community caretaking exception did not justify an officer's decision to park his squad car directly behind a legally parked vehicle and activate his spotlights when that car was in the parking lot of a housing complex, with the engine running, no apparent driver, and a barely-visible individual slumped down in the passenger seat, and further noting that "any purported community-caretaking function in this instance could have been accomplished through a consensual encounter rather than an investigative stop"), *with Crawford*, 659 N.W.2d at 543 (upholding a stop after noting that the officer "did no more than was reasonably necessary").[2]

The absence of sufficient facts to support the detention of Kurth and his vehicle is further demonstrated by Officer Weiler's recorded advice to Officer Jones. Officer Weiler told Officer Jones he should make the call on whether to initiate a traffic stop depending on how Kurth was driving: "[I]t's your call depending on how he's driving." But Kurth was driving appropriately. It thus appears that Officer Weiler did not perceive any danger to public safety. Additionally, according to the recording,

---

[2]The Supreme Court said in *Cady*, "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." 413 U.S. at 447, 93 S. Ct. at 2531, 37 L. Ed. 2d at 718. However, this is not the same as saying that less intrusive alternatives are irrelevant. In *Cady*, the only alternative that was mentioned would have required "the posting of a police guard during the night"—i.e., something that was costly and impractical. *Id.* Here the State does not dispute that Officer Jones could have just as effectively approached Kurth's vehicle without seizing it.

Officer Jones called in the license plate on Kurth's vehicle before making the stop. That action seems inconsistent with a public safety purpose but is certainly consistent with an investigative purpose.

The State argues that the officers' subjective intent was irrelevant, i.e., that it matters not whether their motive for stopping Kurth was to check on whether he had been drinking rather than to see if he needed their help. However, these officers' perceptions as to the possible need for a stop as reflected in their radio communications are certainly evidence of what a *reasonable* officer would have thought was necessary.[3]

---

[3]We have previously maintained that the availability of the community caretaking exception "requires an objective analysis of the circumstances confronting the police officer." *Crawford*, 659 N.W.2d at 542; *see also Tague*, 676 N.W.2d at 204 (referring to "an objective standard"); *Carlson*, 548 N.W.2d at 141–42 (stating that "the subjective part of the analysis should now be abandoned when applying the emergency-aid doctrine" and that reasonableness should be tested "only on the basis of the objective circumstances"). At first glance, the term "bona fide" could be read as implying that law enforcement must have made the stop or seizure for actual community caretaking purposes. Indeed, the Wisconsin case from which we borrowed that term indicates that a stop will not be sustained under the community caretaking exception if the alleged community caretaking function was a "subterfuge." *Anderson*, 417 N.W.2d at 414. In *Cady*, the Supreme Court apparently deemed it significant that protection of the community was the actual motive for the police officer's actions. 413 U.S. at 443, 93 S. Ct. at 2528, 37 L. Ed. 2d at 716 (noting "the findings with respect to Officer Weiss' specific motivation and the fact that the procedure he followed was 'standard' "). As one commentator has pointed out, there is some logic to applying a purely objective test when the issue is whether probable cause or reasonable suspicion exists to believe a crime has been committed, but *not* when the community caretaking exception is involved. Mary Elisabeth Naumann, *The Community Caretaking Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 359–60 (1999). In the former instance, the probable cause (or reasonable suspicion) itself is the legal justification for the officer's actions, so the subjective motivation of the officer is irrelevant. *Id.* However, in the latter example, it is the officer's activity (i.e., his or her engagement in community caretaking) that justifies the actions, so it may be appropriate to require both objective reasonableness *and* subjective good faith. *Id.* at 365. One can also argue that a subjective good faith component is needed to keep the community caretaking exception within its own confines and prevent it from becoming a way to expand other types of warrantless searches and seizures. After all, the Supreme Court suggested in *Cady* that legitimate community caretaking activity should be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441, 93 S. Ct. at 2528, 37 L. Ed. 2d at 715. However, subsequent Supreme Court precedent has clarified that the

In sum, even based upon a purely objective appraisal of the evidence, we cannot sustain Officer Jones's seizure of Kurth after Kurth parked his car as "bona fide community caretaking activity" within the meaning of our precedents.

**C. Balancing.** Because we have concluded that the detention of Kurth and his vehicle does not qualify as community caretaking activity, we are not required to reach the third prong of this analysis, that is, to consider whether "the public need and interest outweigh the intrusion upon the privacy of the citizen." *Crawford*, 659 N.W.2d at 543. Nonetheless, we believe some discussion of this element would be appropriate.

We agree with the State that the intrusion upon Kurth's privacy was somewhat diminished because he was not being pulled over; his vehicle was already at a standstill. Nonetheless, the fundamental point remains that it was a seizure. And for reasons already discussed, the State's public safety concern based on the damage to Kurth's vehicle seems marginal at best. The car was drivable; Officer Jones had inspected the front of the car and determined the damage was "not significant"; and Kurth, having parked at a restaurant, was in a position to address that damage. Assuming that Kurth needed a friendly

---

constitutional reasonableness of a traffic stop or an emergency aid entry does not depend on the actual motivations of the *individual* officers involved. *See, e.g., Brigham City v. Stuart*, 547 U.S. 398, 404–05, 126 S. Ct. 1943, 1948, 164 L. Ed. 2d 650, 658–59 (2006) (noting, however, that an inquiry into *programmatic* purpose is sometimes appropriate); *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774, 135 L. Ed. 2d 89, 98 (1996); *cf. City of Ontario v. Quon*, __ U.S. __, __, 130 S. Ct. 2619, 2623, 177 L. Ed. 2d 216, 220 (2010) (finding a warrantless search of a public employee's pager to be reasonable because it was "motivated by a legitimate work-related purpose" and "was not excessive in scope"). In light of the United States Supreme Court's precedents, and our own, we reiterate that the relevant test for determining whether the community caretaking exception applies is an objective one based on the information available at the time of the stop and does not depend upon the subjective motivations of the individual officers involved.

reminder to take a look at the front end of his vehicle, this could have been provided without activating the patrol car's emergency lights and blocking him in. A balancing of public interest and privacy considerations does not favor the State.[4]

We acknowledge some similarities between the present case and *People v. Laake*, 809 N.E.2d 769 (Ill. App. Ct. 2004), where a driving-under-the-influence arrest and subsequent conviction were upheld. There, a sheriff's deputy, who had received a report of a possible intoxicated driver, came upon a vehicle parked on the side of the road around 3 a.m. with its brake lights on. *Laake*, 809 N.E.2d at 770–71. The deputy pulled in behind the vehicle and activated his patrol car's overhead emergency lights, later testifying that his purpose in stopping behind the vehicle was to check on the welfare of its driver and that the lights were activated "as a precaution to alert other motorists of his squad car" in an area that was not well lighted. *Id.* at 771. It turned out that the motorist had a flat tire and was intoxicated, although neither fact was previously known to the deputy. *Id.* Also, the court acknowledged that once the emergency lights were activated, "a reasonable person in [the defendant's position] would have felt compelled to stay put." *Id.* at 772. Nonetheless, after accepting the trial judge's finding that the deputy's purpose was to check on the driver's welfare and not to conduct an investigation, the appellate court found the

---

[4]The United States Supreme Court has cautioned in a somewhat different context that "the balancing of interests must be conducted with an eye to the generality of cases." *Wyoming v. Houghton*, 526 U.S. 295, 305, 119 S. Ct. 1297, 1303, 143 L. Ed. 2d 408, 418 (1999). But even viewed from a broader perspective, this case involves a seizure of the driver of a parked car based on the fact that the vehicle had sustained limited property damage with no indications of improper (or even unusual) driving. The State cites no example to us of a seizure in comparable circumstances being upheld under the community caretaking exception.

community caretaking exception applicable and sustained what it viewed as a "technical detention." *Id.* at 773.

We think *Laake* is distinguishable, although the differences are not great. Here, Kurth was not on the shoulder of the road, but in the safer territory of a parking lot of an open restaurant. Also, here the officer could not and did not argue that he activated his emergency lights for his own protection; this was an actual seizure, not merely a "technical" one. While the officer here had specific knowledge that Kurth had hit a sign that had fallen into the road, he also had specific knowledge that the damage was "not significant" and that the car remained drivable. *Cf. State v. Montgomery,* Nos. A–0705–06T4, A–1926–06T4, 2009 WL 2365336, *3 (N.J. Super. Ct. App. Div. August 3, 2009) (holding that an officer who had received a report about a disabled van and then stopped that van when he saw it start moving could not rely on the community caretaking exception, despite his claim that "it is not uncommon for a vehicle to break down again after it has malfunctioned"); *State v. DeArman,* 774 P.2d 1247, 1249–50 (Wash. Ct. App. 1989) (rejecting community caretaking grounds for a stop where the vehicle initially stopped for 45–60 seconds at a stop sign but then moved forward and further noting that the officer "himself testified that he realized the vehicle was not disabled but proceeded with the stop because he had become 'suspicious' ").

Finally, because we have concluded that Officer Jones's conduct violated Kurth's rights under the Fourth Amendment to the United States Constitution, it is unnecessary for us to reach Kurth's arguments under article I, section 8 of the Iowa Constitution.

**IV. Conclusion.**

For the reasons stated, we reverse the denial of Kurth's motion to suppress as well his conviction and sentence and remand for further proceedings.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Appel, J., who concurs specially.

**APPEL, Justice (concurring specially).**

The result in this case is based solely on the Fourth Amendment to the United States Constitution. It is not based upon article I, section 8 of the Iowa Constitution. The sole reliance on federal law is not unreasonable because, as is demonstrated by the majority opinion, there is a large body of federal law that provides a clear path to deciding this case. When a party raises both federal and state constitutional issues, we have held that this court has the discretion to proceed first with either the federal or state issue. *See State v. Pals*, 805 N.W.2d 767, 772 (Iowa 2011); *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010).

I note, however, the community caretaking exception embraced by a majority of the United States Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 93 S. Ct. 2523, 37 L. Ed. 2d 706 (1973), is an amorphous doctrine. When the term "reasonable" is coupled with a balancing test to determine the scope of the exception, there is little basis for principled decision making and a substantial risk that the exception may engulf search and seizure law. *See New Jersey v. T.L.O.*, 469 U.S. 325, 370, 105 S. Ct. 733, 757–58, 83 L. Ed. 2d 720, 753 (1985) (Brennan, J., dissenting) (noting that the Court has an obligation to provide a framework to resolve cases beyond conclusory recitation of the results of a balancing test); *United States v. Rabinowitz*, 339 U.S. 56, 83, 70 S. Ct. 430, 443, 94 L. Ed. 653, 669 (1950) (Frankfurter, J., dissenting) ("It is no criterion of reason to say that the district court must find [a search] reasonable."), *overruled on other grounds by Chimel v. California*, 395 U.S. 752, 768, 89 S. Ct. 2034, 2042–43, 23 L. Ed. 2d 685, 696–97 (1969).

It has been suggested that, in light of the risk of abuse inherent in the community caretaking exception, the exclusionary rule should apply to evidence seized that is unrelated to the community caretaking purpose of the stop. *See* Michael R. Dimino, Sr., *Police Paternalism: Community Caretaking, Assistance Searches, and Fourth Amendment Reasonableness*, 66 Wash. & Lee L. Rev. 1485, 1557–58 (2009) (citing 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.1(c), at 20 n.67 (4th ed. 2004)). At least one court in Utah has adopted a slightly different approach, namely, that in nonemergency community caretaking searches, the exclusionary rule would apply. *Provo City v. Warden*, 844 P.2d 360, 364 (Utah Ct. App. 1992), *aff'd* 875 P.2d 557 (Utah 1994). We are, however, not required today to decide any questions that may be posed regarding the existence of or scope of any community caretaking exception under article I, section 8 of the Iowa Constitution. We decide only the federal constitutional question under the Fourth Amendment.

Nothing in the majority opinion should be misconstrued to suggest that we have affirmatively adopted the federal framework as the proper search and seizure framework under the Iowa Constitution in all cases. In *State v. Tague*, 676 N.W.2d 197, 205–06 (2004), this court, as correctly noted by the majority, cited Fourth Amendment cases in resolving a case involving "community caretaking" under the Iowa Constitution, article I, section 8. The parties in *Tague*, however, did not suggest that the Iowa constitutional provision required a standard different than the federal approach. Indeed, the parties did not cite the Iowa Constitution. When the parties do not advocate a different standard under the Iowa Constitution, we ordinarily adopt the federal standard, but reserve the right to apply it in a different manner, or "with

teeth." *See State v. Oliver*, 812 N.W.2d 636, 649–50 (Iowa 2012) (citing with approval *State v. Breugger*, 773 N.W.2d 862, 880, 883 (Iowa 2009)); *Pals*, 805 N.W.2d at 771–72; *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 6–7 (Iowa 2004). Of course, when the parties suggest that we depart from the federal approach to search and seizure issues under the Iowa Constitution, we are free to do so. *Ochoa*, 792 N.W.2d at 291 (rejecting under article I, section 8 of the Iowa Constitution the approach of *Samson v. California*, 547 U.S. 843, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), which authorized suspicionless searches of homes of parolees under the Fourth Amendment); *State v. Cline*, 617 N.W.2d 277, 292 (Iowa 2000) (rejecting under article I, section 8 of the Iowa Constitution the holding of *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), which recognized a good faith exception to the exclusionary rule under the Fourth Amendment), *overruled on other grounds by State v. Turner*, 630 N.W.2d 601, 606 & n.2 (Iowa 2001). Indeed, we "jealously" guard our right to take an independent approach under the provisions of the Iowa Constitution. *Zaber v. City of Dubuque*, 789 N.W.2d 634, 654 (Iowa 2010); *State v. Hoskins*, 711 N.W.2d 720, 725 (Iowa 2006).

Under the circumstances of *Tague*, where the parties did not advocate an independent standard, we cited cases using the federal standard under our state constitution not to make a deliberate choice between Fourth Amendment and other potential state constitutional approaches but because of the limited advocacy of the parties. *See In re Det. of Hennings*, 744 N.W.2d 333, 338–39 (Iowa 2008) (declining to consider substantive independent state standards when parties did not suggest how state standard should be different from federal model). Whether we would develop different doctrine under the Iowa Constitution

for the community caretaking exception when presented with a persuasive argument is an open question that has not been addressed by the court.