# IN THE COURT OF APPEALS OF IOWA

No. 14-0521
Filed March 11, 2015

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**VICTORIA LYNN SELLERS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Boone County, James B. Malloy, District Associate Judge.

Victoria Sellers appeals from her conviction on one count of operating while intoxicated. She claims the district court erred in denying her motion to suppress evidence obtained as a result of the stop of her vehicle. **REVERSED AND REMANDED.**

Grant C. Gangestad of Gourley, Rehkemper, & Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Heather Ann Mapes, Assistant Attorney General, Adria Kester, until withdrawal, and Dan Kolacia, County Attorney, and Kailyn Heston, Assistant County Attorney, for appellee.

Heard by Potterfield, P.J., and Tabor and Bower, JJ.

**POTTERFIELD, P.J.**

Victoria Sellers appeals from her conviction on one count of operating while intoxicated. She claims the district court erred in denying her motion to suppress evidence obtained as a result of the seizure of her vehicle.

## I. Factual and Procedural Background

In the early morning hours of December 1, 2013, a sheriff's deputy on patrol observed a car facing the opposite direction on the roadway. As he passed the car, the deputy observed that the car was stopped. He was unsure whether the car was stopped on the side of the road or on the traveled portion of the road. He turned around to approach the car from behind because, in his words, it "[j]ust seemed suspicious that there would be a car stopped . . . with the lights on." When he approached the vehicle from behind, he saw it was pulled over completely onto the shoulder of the road. The officer believed the car was about a quarter-mile to a half-mile farther down the road than it had been when he had first observed it.

As he pulled in behind the car, he turned a plain white spotlight onto the car but did not turn on his forward-facing overhead lights to indicate he was an officer or that the car was being stopped.[1] After a pause, the driver used the left turn signal to indicate her intention to merge back onto the road and go on her way. The car shifted into gear and began to pull forward. The deputy then

---

[1] The officer did turn on his rear-facing flashing overheads to indicate to any oncoming traffic that the patrol car was stopped on the side of the road. However, the officer believed this would not have been visible to the driver of the stopped car in front of him.

turned on his flashing overhead lights and seized the car. The driver immediately ceased her attempt to merge back onto the road and fully complied with the stop.

As a result of evidence obtained during the seizure, Sellers, the driver of the car, was charged with operating while intoxicated (OWI). Sellers moved to suppress all evidence obtained as a result of the stop, claiming the seizure was a violation of her constitutional protection against unreasonable searches and seizures. The district court held a hearing on the motion on January 28, 2014. The evidence presented at the hearing consisted of a video recording of the incident taken from the deputy's patrol car camera and the testimony of the deputy himself.

In addition to the deputy's testimony that it "[j]ust seemed suspicious that there would be a car stopped . . . with the lights on," he further testified he pulled up behind the vehicle "to make sure whoever was in the vehicle was okay, didn't need medical attention." He testified, "I was just stopping to check to see if she needed assistance with anything." However, after he pulled in behind Sellers's car, he did not check on her medical condition but instead called dispatch to run her plates.

After Sellers had signaled her intention to merge back onto the road and proceed on her way, the deputy testified he then had a suspicion "[o]f either medical condition or possibly OWI or an impaired driver at that time in the morning." He described the facts giving rise to his suspicion of an impaired driver:

> Just the way that she stopped. Looked to me like [she] was stopped the first time in the traveled portion of the road. She had left where she was stopped the first time and then drove quarter to

half mile and then stopped again. That just raised my suspicions that something was going on.

He additionally noted that her attempt to go on her way and the early morning hour contributed to his suspicions.

The district court orally denied the motion to suppress at the end of the hearing. It explained, "The time of day, the manner of the stop just is very unusual." The court found the deputy had a reasonable suspicion that criminal activity—i.e. OWI—was afoot under the circumstances. It also found the deputy's seizure was supported as part of his community-caretaking function because "there could be medical reasons for all of this to take place."

The court issued a written order confirming its oral denial of the motion to suppress. Sellers waived a jury trial. She was convicted following a stipulated trial on the minutes of testimony. She now appeals, asserting the district court erred when it failed to suppress all evidence flowing from the traffic stop because the seizure was unconstitutional.

## II. Standard of Review

Sellers argues the stop violated her constitutional rights under both the United States Constitution and the Iowa Constitution. U.S. Const. amend. IV; Iowa Const., art. I, § 8. We review her claim de novo. *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012). We make an independent evaluation of the totality of the circumstances unique to her case as shown by the record. *Id.*

## III. Discussion

The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated." That provision is made applicable to the states through the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The Iowa Constitution includes the same relevant language as the Fourth Amendment. *See* Iowa Const., art. I, § 8.

To comply with these constitutional mandates, "a search or seizure must be conducted pursuant to a warrant issued by a judge or magistrate . . . [u]nless an exception to the warrant requirement applies." *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). The deputy in this case had no warrant to seize Sellers, so the district court relied upon two exceptions to the warrant requirement to support the seizure. Sellers asserts that neither exception is applicable on the facts of this case.

A. Reasonable Suspicion

First, a well-established exception to the warrant requirement "allows an officer to briefly stop an individual or vehicle for investigatory purposes when the officer has a reasonable, articulable suspicion that a criminal act has occurred, is occurring, or is about to occur."[2] *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010). For an investigatory stop to qualify under the reasonable-suspicion exception, "the State must prove by a preponderance of the evidence the officer had specific and articulable facts that, taken together with rational inferences from those facts, would lead the officer to reasonably believe criminal activity is

---

[2] Because the reasonable-suspicion exception only supports a stop to investigate criminal activity, a seizure under this exception cannot be supported by the deputy's stated reason that he wanted to see if Sellers "needed assistance with anything" or by his suspicion of a "medical condition." These motivations could only support a warrantless seizure under the community-caretaker exception discussed below. As to the scope of our reasonable-suspicion analysis, therefore, we are limited to whether the deputy's suspicion of a possible OWI was reasonable.

afoot." *Id.* at 781 (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "A mere hunch, unparticularized suspicion, or curiosity will not justify an investigatory stop." *Id.*

We do not agree with the district court that the deputy had a reasonable suspicion of criminal conduct. As to specific and articulable facts, the deputy testified he was unsure of precisely what he saw upon his initial sighting of Sellers's car as he passed. He testified,

> [T]he first time I observed the vehicle I don't know if it was over the side of the road or if it stopped in the traveled portion of the road; *so all I can say is that when I pulled in behind the vehicle, it was pulled over off the highway* at that point.

(Emphasis added.) As the district court itself noted, "there [were] plenty of reasons the car could be stopping."

The fact that Sellers had pulled over to the side of the road—even taken together with the fact that Sellers attempted to go on her way prior to the formal seizure—does not give rise to a reasonable suspicion that criminal activity is afoot. Neither are there any rational inferences of such activity. The deputy's testimony was clear that he did not observe any traffic violations.[3] He did not

---

[3] The State argues for the first time on appeal the stop was supported by reasonable suspicion because the deputy observed Sellers violating Iowa Code section 321.366(1)(f) (2013), which provides:

> It is unlawful for a person . . . on a fully controlled-access facility . . . [to s]top, park, or leave standing a vehicle, whether attended or unattended, upon the shoulders, or the right-of-way except at designated rest areas or in case of an emergency or other dire necessity.

Sellers argues she did not violate this provision because the road in question was not a fully controlled-access facility, and section 321.366 therefore has no application to the facts of this case. *See* Iowa Admin. Code r. 761-112.2(306A) (defining "fully controlled access highway" as a highway with no permanent at-grade access and with permanent access points only at interchange locations). However, we may not pass upon the question of this provision's applicability because the State did not raise it before the trial court and the trial court did not consider or rely upon it. "Issues on appeal not raised in

observe any suspect driving, such as Sellers having any difficulty maintaining her lane. The vehicle was in working order, and there were no equipment failures that violated the law.

Based on the few specific and articulable facts in the record, the deputy claimed the circumstances "just raised my suspicions that something was going on." We find the deputy's expressed reasons for seizing Sellers with regard to any criminal activity to be a "mere hunch" and "an unparticularized suspicion." *See id.* The State has not shown by a preponderance of the evidence that a reasonable suspicion of criminal activity arose from the facts of this case; therefore, the reasonable-suspicion exception to the warrant requirement cannot support the deputy's seizure of Sellers's vehicle.

B. Community Caretaking

Second, the United States Supreme Court has crafted another exception to the warrant requirement commonly known as the community-caretaking exception. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973). Local police do not run afoul of the constitution if they make a seizure pursuant to any proper community caretaking functions, which "are totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute."[4] *Id.* The Iowa Supreme Court has applied the exception to find some

---

the district court are deemed waived." *State v. Meyers*, 799 N.W.2d 132, 147 (Iowa 2011).

[4] As a corollary to the limit of our scope of review on the matter of reasonable suspicion, the scope of our review on the matter of the community-caretaker exception is likewise limited to the deputy's expressed intention to see if Sellers "needed assistance with anything" or was experiencing medical issues. The deputy's suspicion or investigation of OWI is a criminal consideration and is therefore subject to the reasonable-suspicion— and not the community-caretaker—exception to the warrant requirement.

traffic stops proper—*see, e.g.*, *State v. Crawford*, 659 N.W.2d 537, 543–44 (Iowa 2003)—and others improper—*see, e.g.*, *State v. Tague*, 676 N.W.2d 197, 205–06 (Iowa 2004).[5]

> [C]ommunity caretaking cases require a three-step analysis: (1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?

*Crawford*, 659 N.W.2d at 543. Only if we can answer all three inquiries in the affirmative will the seizure be considered proper as an exception to the warrant requirement. *Id.* The analysis is an objective one in which we consider the unique circumstances confronting the deputy and determine whether his actions were reasonable under those circumstances. *Kurth*, 813 N.W.2d at 277.

As to the first step, it is uncontested that a seizure occurred when the officer turned on his flashing overhead lights after Sellers signaled that she intended to merge back onto the road.

As to the second step, we must determine whether the officer's conduct constituted "bona fide community caretaker activity." Bona fide community caretaking activity can take three forms: (1) emergency aid, (2) automobile

---

[5] Sellers argues the Iowa Constitution's protection against unreasonable seizures should be greater than that provided by the U.S. Constitution and the scope of the community-caretaker exception should therefore be constrained in Iowa. Our supreme court has used the community-caretaker exception in both the federal and state constitutional context; however, it has not determined whether the "analysis would differ under the Fourth Amendment" of the United States Constitution as opposed to analyses under the analogous provision of the Iowa Constitution. See *Kurth*, 813 N.W.2d at 275 n.1; *compare Crawford*, 659 N.W.2d at 543 (analyzing the exception under the Federal Constitution), *with Tague*, 676 N.W.2d at 204–05 (analyzing the exception under the state constitution). Without a definite distinction between the two analyses, we do not reach Sellers's challenge to the scope of the community-caretaker exception under the state constitution.

impoundment/inventory, and (3) public servant actions. *See Crawford*, 659 N.W.2d at 541. Sellers's vehicle was not being impounded or inventoried, so the deputy's seizure was only permissible if his actions reasonably constituted emergency aid or public service.[6]

To determine whether the deputy's actions constituted bona fide community caretaking activity, "we consider what [the deputy] knew at the moment he stopped the [vehicle]." *Id.* at 543. The stop is not permitted unless "the facts available to the officer at the moment of the seizure would have warranted a reasonable person to believe an emergency [or public service need] existed." *Id.*

In this case, there was no indication that any emergency was taking place. The deputy testified the car appeared to be in good working order and he had not observed any traffic violations, suspect driving, or anything else to suggest the driver was injured. His decision to first run Sellers's plates instead of immediately checking on her condition is inconsistent with his claim that he suspected the driver might have needed medical assistance. *See Kurth*, 813 N.W.2d at 279 ("That action [of calling the driver's plates in] seems inconsistent with a public safety purpose but is certainly consistent with an investigative purpose."). Neither was there any indication Sellers needed the deputy to perform any public service function or to assist her. When Sellers signaled her

---

[6] As examples, "assisting a motorist with a flat tire might be an example of the public servant doctrine, whereas providing first aid to a person slumped over the steering wheel with a bleeding head gash would fall under the emergency aid doctrine." *Kurth*, 813 N.W.2d at 277–78.

intent to merge back onto the road and carry on her way, she also indicated she did not require or expect any assistance from whoever had stopped behind her.

Our case law indicates much more is needed to justify a seizure based on an officer's role as a community caretaker than appears in the record in this case. In *Kurth*, our supreme court noted a community-caretaking function may have justified a stop immediately after an officer observed a car hit a road sign, but the community-caretaker need had disappeared prior to the seizure because the car was already parked and the officer had already ascertained that no significant damage to the car had occurred. *See id.* at 278. Likewise, the deputy's reliance on the community-caretaker exception in this case may have justified a seizure of Sellers's car when he first stopped behind her, but he did not seize the car at that time. It was not until Sellers began to pull back on the roadway that the officer initiated the seizure.

In *Tague*, our supreme court held even a vehicle crossing an edge line of a divided roadway is not sufficient to give rise to a concern of a fatigued driver that would support a seizure under the community-caretaker exception. *Tague*, 676 N.W.2d at 205. Additionally, *Tague*, like the case before us, involved an incident occurring in the early morning hours. *Id.* at 200. We are therefore not persuaded by the State's argument that the time of day in this case— approximately 2:20 in the morning—adds weight to its community caretaker argument.

Typically, a seizure justified under the community-caretaker exception involves either an officer acting on some reported information that a risk to the community exists or the officer's own direct observations of an emergency or

public service need.  *See, e.g.*, *Crawford*, 659 N.W.2d at 543 (explaining the officer's actions resulted from a report that a male subject had taken pills, was acting in an agitated and physically aggressive manner, was confused as to his own whereabouts, and wanted the police to take him home); *State v. Carlson*, 548 N.W.2d 138, 142–43 (Iowa 1996) (discussing the officers' actions, which resulted from a missing-person report along with knowledge that the person missing had been attempting to escape from a physically abusive relationship); *see also Kurth*, 813 N.W.2d at 278 (citing favorably case law from other jurisdictions in which officers' direct perception of vehicle defects permitted them to stop the drivers to inform them of the defect or dangerous condition). However, the officer in this case observed no discernable issues with Sellers's car or driving and was not acting on any information or report.

"[A]ctions under [the community-caretaker] exception must be limited to the justification thereof, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance."  *Kurth*, 813 N.W.2d at 278 (citations and internal quotation marks omitted).  The deputy in this case testified that he pulled up behind Sellers "to check to see if she needed assistance with anything."  Once Sellers indicated she did not need assistance by attempting to go on her way, the justification for the officer's community-caretaker function disappeared.

At the moment he seized the vehicle, the facts available to the deputy would not have reasonably caused him to believe an emergency existed or Sellers needed his assistance in a public service capacity.  Therefore the

community-caretaker exception to the warrant requirement does not support the deputy's seizure of Sellers's vehicle.[7]

### IV. Conclusion

The reasonable-suspicion and community-caretaker exceptions give officers wide latitude in performing their societal functions, but that latitude cannot be unlimited lest the exceptions subsume the rule. In this case, the State has failed to show by a preponderance of the evidence that the deputy's suspicion, though he may have had one, rose to the level of a *reasonable* and *articulable* suspicion. The State has also failed to show the seizure was necessary for the deputy to perform his role as a community caretaker.

Therefore, in the absence of a warrant, the seizure of Sellers's vehicle runs contrary to her constitutional protection against unreasonable searches and seizures. Evidence obtained as a result of the seizure must be suppressed. *See State v. McCoy*, 692 N.W.2d 6, 23 (Iowa 2005) ("The exclusionary rule bars the use of both evidence directly seized in an unlawful detention and evidence discovered indirectly through the use of evidence or information gained in the

---

[7] Because the State's reliance on the community-caretaker exception fails at the second step of the analysis, we need not consider the third step—whether the public need and interest outweighed the intrusion upon Sellers's privacy. However, we note that the weight of the public interest is heavily diminished in this case by the fact that there was no evidence of a need for police intervention at the time of the seizure. We may not weigh the value to the public interest retrospectively with the awareness in hindsight that Sellers was impaired. We must weigh the public interest based on what the deputy knew at the time of the seizure. *See Crawford*, 659 N.W.2d at 543. The State argues that, "[h]ad Sellers not been impaired, the conversation would have quickly ended." The State's use of the benefit of hindsight in its argument is contrary to the state of the law, and its assertion is therefore unpersuasive.

unlawful detention."). We reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**