**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**February 18, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL JAMES BOSMAN,

    Defendant - Appellant.

No. 21-1076
(D.C. No. 1:19-CR-00213-RM-1)
(D. Colo.)

_____

### ORDER AND JUDGMENT*

_____

Before **MATHESON**, **EBEL**, and **PHILLIPS**, Circuit Judges.

_____

On the morning of March 7, 2019, three police officers were dispatched to arrest Albert Stuart, who was asleep in the front seat of a car parked in a motel parking lot. Defendant-Appellant Michael James Bosman was asleep in the back seat. While one of the officers was arresting Mr. Stuart, the other officers told Mr. Bosman to exit the car so they could identify him. When Mr. Stuart informed them Mr. Bosman was armed, the officers ordered Mr. Bosman at gunpoint to leave the car. They threatened to shoot him for any errant movement. Mr. Bosman fell out of

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

the car, and a gun fell on the ground behind him.  Mr. Bosman was charged for unlawfully possessing a firearm as a felon under 18 U.S.C. § 922(g)(1).

Mr. Bosman moved to suppress the firearm, claiming the officers used excessive force when they told him to exit the car.  The district court denied his motion.  He entered a conditional guilty plea under Federal Rule of Criminal Procedure 11(a)(2) and appealed the denial of his suppression motion.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A. *Factual History*[1]

At around 9:00 a.m. on March 7, 2019, Colorado Springs Officers Gilman, Hallas, and Sandoval responded to a tip that Mr. Stuart was asleep in a Chevrolet Impala in the parking lot of a motel in a high-crime area.  Mr. Stuart had an outstanding felony arrest warrant for multiple counts of identity theft and property offenses.

Upon arrival, the officers activated their body cameras and approached the car.  ROA, Vol. IV Attachments A-C.  There were bystanders in the vicinity of the parking lot.  ROA, Vol. III at 206.  Mr. Stuart was asleep in the front passenger seat.  Another man—later identified as Mr. Bosman—was asleep in the back seat, which was cluttered.  *Id.* at 208.

---

[1] Because Mr. Bosman does not contest the district court's factual findings, we rely on those findings as well as the officers' body camera footage.  *See* ROA, Vol. III at 202-07; ROA, Vol. IV Attachments A-C.

Officer Hallas knocked on the passenger window, awakening Mr. Stuart. ROA, Vol. IV Attachment A at 00:37-47. Officer Hallas ordered him out of the car. *Id.* Officer Gilman was standing slightly behind Officer Hallas and took his firearm out but pointed it downwards (in the "low ready" position). ROA, Vol. III at 74. The officers told the two men to put their hands up, and both men complied. ROA, Vol. IV Attachment A at 00:45; ROA, Vol. III at 202-03.

Officer Hallas opened the passenger door, which triggered the car alarm. ROA, Vol. IV Attachment A at 00:55-1:05. He asked Mr. Stuart if there were any weapons in the car. *Id.* Mr. Stuart quickly looked back toward Mr. Bosman but did not give a clear answer. *Id.*; *see also* ROA, Vol. III at 203. Officer Hallas again asked if there were weapons in the car, and Mr. Stuart said no. ROA, Vol. IV at 00:55-1:05; ROA, Vol. III at 203. Mr. Stuart exited the car, and Officer Hallas handcuffed him. ROA, Vol. IV Attachment A at 01:03-20. He then led Mr. Stuart toward the patrol vehicle. *Id.*

Officer Gilman moved to the open front passenger seat door and began speaking with Mr. Bosman, who remained in the back seat on the driver's side. *Id.* at 01:37-50. By this point, Officer Sandoval had moved to the rear driver-side door. *Id.* In a conversational tone, Officer Gilman explained they were trying to identify him and instructed him to exit the car with his hands on his head. *Id.* Officer Gilman warned him against reaching toward his waist. *Id.* at 1:45-46.

While he was being arrested, Mr. Stuart alerted Officer Hallas that he had a gun, so Officer Gilman moved to the patrol car to help Officer Hallas. ROA, Vol. IV

3

Attachment B at 00:08-58.  After finishing the arrest, Officer Gilman returned to the open passenger door and instructed Mr. Bosman to open the door.  ROA, Vol. IV Attachment A at 02:35-03:09.  His tone remained conversational, and his gun remained in the low ready position.  *Id.*; ROA, Vol. III at 204.

At that moment, Mr. Stuart told Officer Hallas that Mr. Bosman also had a gun.  ROA, Vol. IV Attachment B at 01:54-56.  Officer Hallas shouted to the other officers, "he's got a gun too, supposedly."  ROA, Vol. IV Attachment B at 01:56-58.  Officer Gilman pointed his gun at Mr. Bosman and said, "We have information that you might be armed."  ROA, Vol. IV Attachment A at 03:37-40.  Officer Gilman also warned Mr. Bosman that if his arm moved in a frightening way, he would probably get shot.  *Id.* at 03:40-46.  Mr. Bosman then opened the door, which triggered the car alarm again.  *Id.* at 03:48-56.  Officer Gilman told Mr. Bosman to follow Officer Sandoval's commands, relocated to the driver's side of the car, and pointed his gun at Mr. Bosman.  *Id.* at 03:57-04:06.  Officer Sandoval also took out his gun and pointed it at Mr. Bosman.  *Id.*

Officer Sandoval told Mr. Bosman that if his hands shifted beneath his shoulders, he would shoot him.  *Id.* at 04:00-15.  Officer Sandoval holstered his weapon, grabbed one of Mr. Bosman's wrists, and instructed him to leave the car while keeping his hands up.  *Id.* at 04:15-06:05.  As Officer Sandoval guided Mr. Bosman out of the car, Mr. Bosman fell out onto the ground.  *Id.* at 04:15-25.  A gun fell behind him on the ground.  *Id.* at 04:15-30.  After securing Mr. Bosman, the officers retrieved the gun.  *Id.* at 04:30-06:05.

## B. *Procedural History*

Mr. Bosman was charged with possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). He moved to suppress the firearm, arguing the officers acted unreasonably under the Fourth Amendment by pointing their guns at him and threatening to shoot him.

The district court denied his motion. It explained the officers were making a felony arrest in a high-crime area. At first, they thought no firearms were present. But after Mr. Stuart left the car, he told the officers that he was armed and that Mr. Bosman also had a gun. The officers said the back seat of the car was cluttered. Based on these circumstances, the court recognized an officer safety concern. It concluded the officers acted aggressively but reasonably when they pointed their guns at Mr. Bosman, threatened to shoot him for stray movement, and ordered him to exit the car.

Mr. Bosman conditionally pled guilty under Federal Rule of Criminal Procedure 11(a)(2). He timely appealed the district court's denial of his suppression motion.

## II.  DISCUSSION

Mr. Bosman challenges the district court's denial of his motion to suppress. He does not contest the Officers' authority to order him out of the car. Instead, he argues the Officers acted unreasonably under the Fourth Amendment by pointing their guns at him and threatening to shoot him for sudden movements.

5

A. *Standard of Review*

We review "de novo a district court's determination of the reasonableness of a search and seizure under the Fourth Amendment." *United States v. Dennison*, 410 F.3d 1203, 1207 (10th Cir. 2005). "We look at the totality of the circumstances in reviewing the denial of the motion to suppress." *Id.* "[W]e accept the factual findings of the district court unless they are clearly erroneous, and view the evidence in the light most favorable to the district court's determination." *Id.* (quotations omitted).

B. *Legal Background*

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. A person is seized under the Fourth Amendment when "the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quotations omitted). But "the protection of the Fourth Amendment does not guarantee against *all* seizures." *United States v. King*, 990 F.2d 1552, 1556 (10th Cir. 1993) (quotations and alterations omitted). Rather, it protects "only against *unreasonable* . . . seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985).[2]

---

[2] The Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

A law enforcement officer, "for the purpose of investigation, may briefly detain a person on less than probable cause," *King*, 990 F.2d at 1557; *see United States v. Sokolow*, 490 U.S. 1, 7 (1989), and may also "conduct a limited search for weapons for his or her own protection," *King*, 990 F.2d at 1557; *see Adams v. Williams*, 407 U.S. 143, 145-46 (1972). But the officer's action must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

The police may seize a person to "ensure the safety of the public and/or the individual, regardless of any suspected criminal activity" and may seize an individual's weapon "in order to ensure [his or] her own safety during the encounter," *King*, 990 F.2d at 1560-61.

Evaluating "the reasonableness of [a] seizure depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). "[O]ur evaluation is guided by 'common sense and ordinary human experience.'" *King*, 990 F.2d at 1562 (quoting *Sharpe*, 470 U.S. at 685). But in assessing whether an officer's action was reasonable, we "should not indulge in unrealistic second-guessing." *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985) (quotations omitted). "The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687.

## C. *Analysis*

After carefully reviewing the record, including the officers' body camera footage, we agree with the district court that their actions were reasonable. The officers were effectuating a felony arrest of Mr. Stuart, who was in the same car as Mr. Bosman. They initially asked Mr. Stuart if there were any weapons in the car. Mr. Stuart said no. But after Mr. Stuart left the car, he revealed he was armed and that Mr. Bosman also had a gun. Only then did the officers, reacting to new information and an escalating situation, point their guns at Mr. Bosman.

Perhaps most significant, the officers had no knowledge of where the gun was located. As the district court found, the back seat of the car was cluttered, so there were numerous places where Mr. Bosman could reach for the weapon and thus pose a safety risk to the officers. The officers also had identified bystanders in the vicinity, adding to safety concerns. Under these circumstances, the officers did not act unreasonably by pointing their guns at Mr. Bosman and threatening to shoot for wayward movement.

Mr. Bosman makes two arguments. Both lack merit.

First, his reliance on *United States v. King* is misplaced. There, an officer was directing traffic after an accident when the defendant began honking his horn repeatedly. *King*, 990 F.2d at 1555. When the officer approached the car, the defendant apologized for the commotion. *Id.* The officer noticed a pistol on the defendant's person and immediately drew her revolver and pointed it at the defendant. *Id.* Because the state permitted individuals to have guns in their cars, and

8

because the initial interaction stemmed from the officer's effort to move traffic, we held the officer's action was unreasonable under the circumstances. *Id.* at 1563. Mr. Bosman argues the officers here had similar safety concerns, so their actions also were unreasonable. We disagree. The circumstances in the two cases differ significantly.

In *King*, the officer knew exactly where the firearm was located at all times during her interaction with the defendant. Here, the officers were not aware that Mr. Bosman had a gun until Mr. Stuart alerted them. So it was reasonable for them to take additional precautions once they learned about the gun, especially because they did not know where it was located.

Moreover, the officer in *King* was directing traffic and had no reason to be on higher alert when she noticed the defendant's gun. But the officers here were effectuating a felony arrest of someone in the same car as Mr. Bosman. Although both the defendant in *King* and Mr. Bosman may have complied with instructions from law enforcement, the officers here were on higher alert when they began interacting with Mr. Bosman. They pointed their guns at him only when they suddenly learned he was armed and did not know where the gun was located.

*King* is therefore inapposite.

Second, Mr. Bosman contends the officers should have simply commanded him to get out of the car. But doing so may have put them at greater risk given the circumstances. And we cannot base our determination of reasonableness solely on "whether some other alternative was available." *Sharpe*, 470 U.S. at 687. We thus

9

decline Mr. Bosman's request that we engage in the "unrealistic second-guessing" that the Supreme Court has warned against. *Montoya de Hernandez*, 473 U.S. at 542 (quotations omitted).

## III. **CONCLUSION**

We affirm.

Entered for the Court

Scott M. Matheson, Jr.
Circuit Judge